**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **DONALD COE**, **LINDA SMITH**, and **EDWARD YOST**, on behalf of themselves and others similarly situated, | **JURY TRIAL DEMANDED** |
| | **CLASS-ACTION COMPLAINT** |
| Plaintiffs, | **Case No:** |
| *v.* | |
| **CROSS-LINES RETIREMENT CENTER, INC.,** | |
| and | |
| **YOUNG MANAGEMENT CORP.,** | |
| Defendants. | |

<u>**COMPLAINT**</u>

Plaintiffs Donald Coe, Linda Smith, and Edward Yost, on behalf of themselves and others similarly situated, allege the following against Defendants:

**INTRODUCTION**

1.      This case is about a "retirement center" left to rot, with its elderly and disabled tenants captive to bed-bug infestations, decaying rodent bodies, flooding, leaking, and mold. Cross-Lines Retirement Center (the "Center"), located in the Argentine section of Kansas City, Kansas, was initially conceived of as a tranquil, hospitable community for seniors. It has since fallen far from grace, with its vulnerable

1

tenants left to fend for themselves in the face of numerous habitability issues. This case is likewise about slum-lording, with Defendants harvesting federal subsidies despite failing to meet basic habitability standards and taking advantage of the residents' powerlessness.

1.      This is a proposed class action and mass tort which seeks injunctive relief and damages.  Specifically, Plaintiffs propose that this case be managed as follows:

     a.  All injunctive relief will be addressed via one or more classes, for which certification will be sought under Rule 23(b)(2);

     b.  All damages will be addressed via one or more *issue* classes, with determination of causation and damages to be handled by way of individual trials. Plaintiffs anticipate seeking certification of these issue classes under Rule 23(b)(3) and (c)(4).

2.      Because damages will be addressed on an individual basis, Plaintiffs anticipate that multiple other current and former tenants at the Cross-Lines Retirement Center, Inc. will join this case, either by being joined as named plaintiffs, class members, and/or by seeking to intervene. Plaintiffs hereby give notice to Defendants of this potential and that such future plaintiffs may argue that any such claims relate back to this Complaint by virtue of this notice.

3.      Further, should one or more of these classes not be certified, Plaintiffs hereby give notice to the Court and Defendants that they may seek to convert this case, in whole or in part, to a mass tort. Claims of other past, current, and future residents of the Center who may be joined and/or seek to intervene should be deemed to relate back

via this paragraph.

## PARTIES

4.      Plaintiff Donald Coe is a natural person and resident of Cross-Lines Retirement Center in Kansas City, Kansas.

5.      Plaintiff Linda Smith is a natural person and resident of Cross-Lines Retirement Center in Kansas City, Kansas.

6.      Plaintiff Edward Yost is a natural person and resident of Cross-Lines Retirement Center in Kansas City, Kansas.

7.      Defendant Cross-Lines Retirement Center, Inc. (the "Corporation") is a Kansas not-for-profit corporation. The Corporation may be served by serving its resident agent: Cross-Lines Retirement Center, Inc., 3030 Powell Ave., Kansas City, Kansas 66106.

8.      Defendant Young Management Corp. ("Young Management") is a Kansas for-profit corporation. Young Management may be served by serving its resident agent: Dave Lundgren, 22602 State Line Rd., Bucyrus, Kansas 66013.

## JURISDICTION & VENUE

9.      This Court has subject-matter jurisdiction, pursuant to 28 U.S.C. § 1331, over this matter because it is an action under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

10.      This Court also has subject-matter jurisdiction, pursuant to 28 U.S.C. § 1331, over this matter because it is an action under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

11.      This Court has supplemental jurisdiction over the non-federal claims contained herein pursuant to 28 U.S.C. § 1367(a).

12.     This Court has both general and specific personal jurisdiction over Defendants because they are each incorporated in Kansas and have their principal place of business in Kansas. Further, the core facts and acts (or lack of action) by Defendants in this case occurred within Kansas.

13.     Venue in this Court is proper because most, if not all, of the events complained of took place in Kansas.

### FACTS COMMON TO ALL CLAIMS

### The Founding & Purpose of Cross-Lines Retirement Center

14.     The Corporation was incorporated as a not-for-profit Kansas corporation in 1966.

15.     Its articles of incorporation included the following provisions, among others: "To provide for elderly families and elderly persons . . . rental housing . . . and services **specially designed to meet the physical, social, and psychological needs of the aged, and contribute to their health, security, happiness and usefulness in longer living.**" (emphasis added).

16.     A decade later, the Corporation amended those articles to add the "handicapped" to the demographic it intended to serve.

17.     Those articles remain but the Corporation, as described herein, continuously violates them by subjecting its "elderly" and "handicapped" residents to medieval sanitation, a frightening deficit of secure fire-evacuation routes for the disabled, lack of reasonable security measures, a reduction in activity offerings, and, generally, living conditions that are far more likely to lead to a premature demise than to "longer

living." In no significant manner is the Center "specially designed" for the elderly and/or disabled.

18.    As a not-for-profit corporation, per its articles, "No part of the net earnings of [the Corporation]" is to "be distributed to or inure to the benefit of any member, director or officer of [the Corporation], contributor or private individual."

19.    On information and belief, the Corporation's annual revenues are approximately $1.2 million. As described throughout, it's likely that a tiny portion of those funds have been dedicated to maintaining habitable standards at the Center.

20.    As a not-for-profit corporation, the Corporation would typically need to submit an annual report to the office of Kansas' Secretary of State.

21.    For whatever reasons, the Secretary of State, via its website, does not possess an annual report for the Corporation until 1999.

22.    By 1999, none of the Corporation's original directors remained.

23.    In 2002, the Corporation sought reinstatement because it had failed to timely file its annual report.

24.    By 2020—the vintage of the most recent annual report available—the Corporation was governed by nine directors, named as: Cory M. Apple; Tom Finnell; Ted Satterfield; Mark Reilley; Barbara Kill; Donald Crane; Chandra Ward; Mary Jean Grindel; and Kansas Senator Pat Pettey, serving as president.

## The Center

25.    The Center, located at 3030 and 3100 Powell Avenue in Kansas City, Kansas, consists of two residential buildings (Phase I and Phase II), which collectively comprise

approximately three-hundred apartment units.

26.     Phase I is smaller and older than Phase II, with Phase II having been completed in 1971 and originally comprising over two-hundred apartment units by itself:

Phase I



Phase II



27.     The Center, as a low-income complex for seniors and/or people with disabilities, is largely subsidized via the federal Section 8 voucher program. Its U.S. Department of Housing and Urban Development ("HUD") project number is 08444152.

28.     In keeping with the magnanimity of the Corporation's founding purpose, an early postcard featuring the Center stated that it was "[c]onceived and erected through the efforts of concerned citizens to repay our senior citizens for their service to the

community and to enable them to enjoy life more fully.":



29.     The Center, as described more fully below, has declined markedly since its heyday, now keeping its elderly tenants deprived of fundamental aspects of habitability and sanitation, timely or competent property management, and "services specially designed to meet the physical, social, and psychological needs of the aged."

### Defendant Young Management

30.     Defendant Young Management is the Center's property manager and was retained as such by the Corporation.

31.     Defendant Young Management does business in (at least) Kansas, Missouri, Iowa, and Wyoming.

32.     During 2020-21, Young Management took out nearly $1.7 million in COVID-related Paycheck Protection Program loans, claiming that 100 jobs were retained in this regard.

33.     Young Management holds itself out as a HUD-housing specialist:

> Young Management Corporation has trained property management teams that deal with increasingly complicated federally assisted housing programs and HUD-mandated programs.
>
> Our certified occupancy specialists have completed extensive training and testing in administering and managing various types of subsidized programs. Young Management Corporation has achieved excellence on a regional scale in managing affordable communities. Management services are tailored to meet specific needs in the following areas:
>
> - On-Site Property Management Supervision
> - On-Site Preventative Maintenance and Repair
> - Affirmative Fair Housing Marketing Plans
> - Skilled Financial Management
> - Special HUD Reporting
> - Compliance Management
>
> If compliance issues like inspections, resident verifications or reporting seem overwhelming, Young Management Corporation can help; our trained staff will take the burden of meeting HUD compliance requirements. We constantly monitor the ever-changing governmental rules and regulations governing federally funded facilities. Please be sure and take a look at our **services page**.
>
> YMC's mission is to provide superior affordable housing, allowing residents to live in their own home confidently and comfortably and for as long as possible.

34.     While Young Management claims to be an expert at navigating HUD-related bureaucratic hurdles so as to keep federal funds flowing to ownership and management firms, it has failed to maintain a basic standard of habitability for the Center's *residents*.

35.     The Center's Real Estate Assessment Center (REAC) scores support this thesis, revealing a marked decline in scores since Young Management took over:

**KANSAS CITY**

| CROSSLINES RETIREMENT CENTER | 800007191 | 56c* | 7/19/2021 | 71b* | 10/22/2019 | 76c* | 5/30/2018 |
|------------------------------|-----------|------|-----------|------|------------|------|-----------|

36.     REAC inspections are performed by HUD. The asterisk is a component of

the REAC scores, indicating that there are issues with smoke detectors.  The letters—here, "b" and "c"—are also components of the scores.  The letter "c" denotes the existence of exigent fire safety and/or health and safety issues that require "immediate attention or remedy."

37.     For reference, a REAC score of 60 or below is generally considered unacceptably low.

38.     Young Management has also managed Central Park Towers, another HUD-subsidized complex in Kansas City, Kansas, that was highly similar to Phase II in its age, design, and decrepitude:



(Taken from https://news.yahoo.com/central-park-towers-employee-leaves-235027377.html on Oct. 26, 2021).

**Plaintiff Donald Coe**

39.     Plaintiff Donald Coe moved into the Center in June 2015.

40.     He is currently 72 years of age.

41.     Upon moving into the Center, Young Management forged a document in

an attempt to compel Mr. Coe to place a larger security deposit than he had agreed to make.

42.     Mr. Coe suffers from multiple debilitating back problems.

43.     Mr. Coe lives in unit #829 of Phase II.

44.     Mr. Coe has been physically attacked at least three times since moving into the Center.

45.     Because of this, Mr. Coe has requested the reasonable accommodation of better security measures from Young Management but has been refused.

46.     Mr. Coe has complained to various entities, including Young Management, the Kansas City, Kansas Housing Authority, the U.S. Department of Housing and Urban Development, and Angela Markley of the Unified Government, about the living conditions at the Center.

47.     Mr. Coe has suffered from multiple lung infections while noting that there was mold in his apartment and the HVAC system was filthy.

48.     Mr. Coe has been bitten by bed bugs at the Center, including in his unit.

49.     Mr. Coe has also encountered cockroaches, water leaks, and rodents while living at the Center.

50.     As to HVAC issues, Mr. Coe has noted that the Center's commercial air handlers routinely ooze algae, suggesting that they have been poorly maintained, the water inside is dirty, and mold/bacteria/mildew are thriving as a result thereof:



51.     Mr. Coe, on or about November 5, 2021, also encountered an unknown man urinating in the hallway outside of his apartment unit:



**Plaintiff Linda Smith**

52.     Plaintiff Linda Smith moved into the Center in January 2019.

53.     Ms. Smith used then, as she does now, a wheelchair. Ms. Smith currently also uses a walker.

54.     Ms. Smith endured a back surgery that put her in the wheelchair. She also suffers from "foot drop" because of neurological damage.

55.     She is currently 70 years of age.

56.     Ms. Smith lives in unit #824 of Phase II.

57.     Upon learning that she would be assigned to a room on the eighth floor, Ms. Smith informed an employee of Young Management that was not feasible for her

because she was in a wheelchair. The employee told Ms. Smith that was the only unit available and offered her no accommodation.

58.     Such refusal constituted a violation of the ADA and FHA, as well as the bounds of decency.

59.     Young Management's own "House Rules & Regulations" declare:

> **B. Households with disabled members in accessible units:** In accordance with HUD rules, households with a physically disabled member may request a transfer to a specially adapted or accessible unit. Households must provide the name and address of a health care provider from whom management can request verification that a member is disabled and needs a specially adapted or accessible unit. If management receives verification from a health care provider, management will allow the household to transfer to the next available specially adapted or accessible unit.
>
> **C. Households without disabled members in accessible units:** In accordance with the lease, if a household that doesn't include a physically disabled member occupies a unit specially adapted for, or accessible to, the physically disabled, the household must transfer to another unit if a household with a disabled member requires the specially adapted or accessible unit.

60.     Young Management thus inserted its own requirement into its rules and regulations: "Households must provide the name and address of a health care provider from whom management can request verification that a member is disabled . . . ." This is in keeping with the theme that Young Management routinely places the onus of its own responsibilities on the Center's residents.

61.     **More importantly, there was and is _no_ good reason to place a wheelchair-bound senior on a floor where the only means of fire escape would be the elevators** (which should not be used in case of fire anyway).

62.     Not too long after Ms. Smith moved into the Center, there was indeed a fire, on the floor beneath her. **Because she could not evacuate herself, a firefighter had to push/carry her (in her wheelchair) to the elevators.** That fire was likely the one recorded

as follows:

| | 06/10/2019 | 19202-00057 | Fire Damage | Completed | 3100 POWELL AVE, 730, KANSAS CITY KS 66106 |
|---|---|---|---|---|---|

63.     Ms. Smith has repeatedly expressed her concerns in this regard to Young Management, including but not necessarily limited to on-site manager Marla Deel and the former on-site manager, Joyce.

64.     Young Management has thus refused Ms. Smith's request for such reasonable—and *necessary*—accommodation on multiple occasions since early 2019.

65.     Ms. Smith also struggles with the Center's doors, which she finds very difficult to open while in the wheelchair or using the walker.

66.     However, Young Management has also refused such reasonable accommodation—the installation of automated doors for the disabled—claiming that it was not obligated to do as much.

67.     Ms. Smith has been bitten by bed bugs at the Center, including in her unit.

68.     Ms. Smith has also encountered mold, cockroaches, and HVAC issues while living at the Center.

**Plaintiff Edward Yost**

69.     Plaintiff Edward Yost moved into the Center in April 2014.

70.     He is currently 87 years of age and a veteran of the Korean War. Mr. Yost is also wheelchair-bound and suffers from arthritis.

71.     Mr. Yost resides in unit #236 of Phase I.

72.     As someone in a wheelchair who also suffers from arthritis, Mr. Yost has

struggled mightily with the Center's heavy, manual doors.

73.     Mr. Yost has also encountered numerous habitability issues during his years at the Center, including bed bugs, rodents, mold, HVAC issues, and cockroaches.

74.     Mr. Yost has suffered extensive bed-bug bites while living at the Center.

75.     Mr. Yost also carried five dead mice to the Center's management office in order to put them on (further) notice of the rodent infestation.

### Bed-Bug Infestation

76.     Few insects are more difficult to abide than bed bugs: they are exclusively bloodsuckers; prefer to drain blood via exposed skin, preferably that of a person sleeping; leave nasty bites; detrimentally affect microbiomes; and are immensely resilient.

77.     For these reasons, bed bugs significantly impair habitability, pose health hazards, and require professional, intensive remediation.

78.     The Center is infested with bed bugs and has been so for a substantial period of time.

79.     Residents and their guests have repeatedly been bitten and vexed by bed bugs, both in apartments and common areas:



(taken at the Center)



(taken at the Center)

80.     Residents have repeatedly put Defendants on notice of the Center's bed-bug infestation but Defendants have failed to ameliorate it.

81.     Young Management has, in fact, placed the onus on *the residents* to ameliorate the Center's bed-bug infestation. Specifically, Young Management has informed residents that they should manage the problem by using rubbing alcohol or placing their linens and other affected fabrics in *the dryer* for some period of time.

82.     Even if such method—heat treatment via ordinary dryer—helped mitigate the problem here and there, it would obviously do nothing vis-à-vis bed bugs in common areas, walls, cracks, corners, couches, etc.

83.     Pesticides and bug "bombs" are often ineffective at eradicating advanced infestations because of the bugs' developed resistance to such chemicals, the chemicals' inability to kill bed-bug eggs, and/or their failure to treat concealed areas (e.g., inside of walls and cracks). A bed-bug infestation must be consistently and repeatedly treated, often using a combination of heat and chemical treatments.

84.     Further, chemical treatments may well be hazardous in themselves.

85.     Nonetheless, to the extent Young Management has done anything at all about the bed-bug infestation at the Center, it selected just such a dangerous, feckless, and cheap option.

86.     On or about October 22, 2021, Young Management posted the following on residents' doors:



87.     By posting this flyer, Young Management acknowledged the "bedbug problem."

88.     It also admitted that it was going to thoroughly douse the residents' belongings with chemicals, without informing the residents of what the chemicals *were*, why and by whom that treatment was chosen, and who would be administering the

treatment.

89.     Predictably, Young Management blamed the victims of the infestation for putative future recurrences, as if their premature floor-mopping or failure to "[g]ive the treatment time to work" would be the cause of such.

90.     On information and belief, Young Management selected this "treatment" option in response to the possibility of imminent litigation given that it had not posted such flyers before, despite being repeatedly apprised of the bed-bug infestation, and had received word that some tenants were seeking potential legal representation in this regard.

91.     In the "House Rules & Regulations" guide it provided to the Center's residents, Young Management stated, "**Your apartment is your home and keeping it clean is your responsibility . . . Periodic inspections will be made by management to ensure that your apartment is clean and pest-free. An untidy apartment that creates a nuisance for your neighbors could result in your eviction**." (emphasis added).

92.     Further, "**Exterminating services . . . will be supplied on a regularly scheduled basis.**" (emphasis added).

93.     Even further, Young Management recognized the especial severity of the bed-bug problem:

**Bed Bug Policy**

Bed bugs are a growing national problem, and as a result, this policy has been created by Young Management Corporation.  The purpose of this policy is to set forth the roles and responsibilities of all parties which includes not only the Property that you live in but all residents residing within the Property.  The hope is to minimize the potential for bed bugs and to provide guidance in cases where bed bugs are present in an effort to eliminate them as quickly as possible.

Bed bugs are difficult to contain without the proper treatment; therefore, it is imperative that all parties work simultaneously toward a common goal of extermination and elimination.  Left untreated, bed bugs can spread throughout a resident's unit and building, affecting both current and future residents.  The following lists those preventative measures that all residents should take to avoid bed bug infestation:

94.     Yet, despite a long list of bed-bug "prevention tips" for the *residents*, Young Management, and despite being paid to manage the Center, has failed to regularly, if at all, provide such "proper treatment."

95.     Defendants' behavior in this regard has been wanton as it has exploited the residents' evident vulnerability — e.g., relative lack of income and alternative housing, long Section 8 waiting lists — to subject them to dangerous living conditions.

**Rodent Infestation**

96.     In addition to bed bugs, the Center's elderly and disabled residents must also contend with rodents:



(taken at the Center)



(taken at the Center)

97.     It does not require explication as to why a rodent infestation, including the presence of putrefying mouse and rat corpses, is repulsive, unsanitary, and unhealthy.

98.     Defendants have been on notice of the Center's rodent infestation but have failed to remedy it.

99.     Again, Defendants' behavior in this regard has been wanton as it has exploited the residents' evident vulnerability—e.g., low income and dearth of alternative housing, lack of mobility, long Section 8 waiting lists—to subject them to dangerous living conditions.

### Flooding/Leaking

100.    The Center's residents have also been subjected to extensive flooding and leaking.

101.    On information and belief, the Center's roofs—especially that on Phase II— are leaky and inadequate, if not structurally unsound.

102.    Large puddles have been left in Center common areas, including corridors, for extended periods of time. Sometimes, the tenants have been compelled to place receptacles to contain leaks in common areas because Young Management was unresponsive.

103.    During the summer of 2020, (at least) one of the Center's buildings flooded because of a plumbing-related leak that the manager allowed to run for three days, from Friday to Monday.

104.    Plaintiff Donald Coe also recorded part of that sustained leaking/flooding as to his eighth-floor hallway, the veneer floorboards of which were warping because of

the persistent moisture:



105.    Wet floors are especially perilous for many of the Center's residents because of their ages and/or disabilities.

106.    Such moisture also fosters the growth of mold and bacteria and Defendants' failure to quickly and thoroughly remediate excess moisture at the Center has rendered it especially susceptible to enhanced mold and bacterial growth.

107.    Attempting to use a common-area bathroom one afternoon in 2019, Mr. Coe found an open space in its ceiling, with water dripping from that hole into a large, plastic trash container; in that trash barrel a large, living, soaked rodent floated on a foam plate:



108.    Further, a completely exposed wire dangled in that area, with water running off it.

109.    Again, Defendants' behavior in this regard has been wanton as it has exploited the residents' evident vulnerability—e.g., low income and dearth of alternative housing, lack of mobility, long Section 8 waiting lists—to subject them to dangerous living conditions.

## Security

110.    The Center is located in a fairly high-crime area, with violent crime increasing in recent years.

111.    As emphasized, the Center's tenants constitute a vulnerable population. This vulnerability includes physical, in addition to financial, susceptibility because the

Center's residents are, by definition, elderly and/or disabled. Many of the Center's tenants are also mobility-constrained because of physical ailments and/or lack of reliable transportation.

112.     Nonetheless, basic security measures at the Center are effectively nonexistent—the parking lot is not secure and tenants' cars have consistently been vandalized; entry into the Center's buildings has required nothing beyond a four-digit code, which has been widely circulated such that it is virtually meaningless as a security-screening measure; and the Center does not have a dedicated security guard but rather relies on a patrol that intermittently stops by on some irregular basis.

113.     Approximately two years ago, the Center was without an on-site manager for eight or nine months. Defendants' failure to provide an on-site manager for an extended period of time was negligent, for numerous reasons.

114.     As stated, Plaintiff Donald Coe has been physically attacked several times in the past six years.

115.     At a tenants' meeting, Mr. Coe expressed his concern about the Center's extremely lax security measures but was shouted down in that regard by Linda Kemp of Young Management.

116.     This was the same Linda Kemp held out by Young Management as its compliance coordinator for HUD's Section 504-implementing regulations:

Young Management Corporation and this Property do not discriminate on the basis of disability status in the admission or access to, or treatment or employment in, its federally assisted programs and activities.
The person named below has been designated to coordinate compliance with the nondiscrimination requirements contained in the Department of Housing and Urban Development's regulations implementing Section 504 (24 CFR, part 8 dated June 2, 1988).
Linda J. Kemp, Property Supervisor
Young Management Corporation
22602 State Line Road
Bucyrus, KS. 66013

117.    Young Management has refused Mr. Coe's reasonable requests for enhanced security measures at the Center.

118.    Again, Defendants' behavior in this regard has been wanton as it has exploited the residents' evident vulnerability—e.g., low income and dearth of alternative housing, lack of mobility, long Section 8 waiting lists—to subject them to dangerous living conditions.

## Mold

119.    Mold, too, runs rampant at the Center. That this would be the case was entirely foreseeable given its flooding, leaking, poor ventilation, and overall lack of maintenance.

120.    Mold is not only unsanitary but also poses potential health threats and irritants, including severe allergic reactions and asthmatic attacks. These risks are significantly higher for vulnerable populations, such as the elderly and those with existing pulmonary conditions—i.e., for populations such as the Center's tenants.

121.    In the "House Rules & Regulations" guide it provided to the Center's residents, Young Management drives this point home, stating, "**As long as moisture is**

**present, mold can grow . . . It is most often through undiscovered or ignored water problems that a few varieties of mold can become a health issue.**" (emphasis added).

122.   In a recurring theme, Young Management proceeded to list a variety of precautions vis-à-vis mold that the *tenants* should take while declining to explain what Young Management's part would be in proactively controlling mold in common areas, or anywhere at all. Indeed, "**Young Management and this Property will take no responsibility or assume any liability for issues associated with unreported mold.**"

123.   Dampness—especially persistent dampness in a large buildings with extensive HVAC systems—can also foster growth of the legionella bacterium, which causes Legionnaires' disease.

124.   On information and belief, Defendants have committed few, if any, resources to mold inspection, let alone remediation.

125.   Again, Defendants' behavior in this regard has been wanton as it has exploited the residents' evident vulnerability—e.g., low income and dearth of alternative housing, lack of mobility, long Section 8 waiting lists—to subject them to dangerous living conditions.

126.   Plaintiffs note that the mold-related claims are separate from, but in conjunction with, the flooding, leaking, and dampness claims. These should be construed as separate, but complimentary.

<u>**Elevators & Fire Hazards**</u>

127.   While Defendants *seem* to have updated the Center's elevator permits annually, as required, residents have complained on various occasions that elevators

were not working. Tenants have also noted random wires dangling in/out of Center elevators.

128.    While it is common enough for elevators to malfunction, given the Center's overall state, size, the fact that decades passed with no available documents as to inspections or major modifications, and resident population, such malfunction is worrisome as to accessibility as some number of occupants have great difficulty with stairs.

129.    As stated, Young Management placed wheelchair-bound Plaintiff Linda Smith on Phase II's eighth floor despite her protests and still have not moved her despite Ms. Smith's being disturbingly susceptible in the case of fire.

130.    Generally, in the case of fire, occupants of buildings with elevators are directed to *not* use elevators. The primary reasons for this are the possibility of electric-shorting and smoke inhalation via elevator shaft.

131.    As stated, in response to a fire in 2019, a firefighter actually had to move Ms. Smith to the elevator because she could not use the stairs.

132.    Likewise, it is not at all apparent that the Center offers such essential preventative modifications as firewalls or other barriers to the spread of fire, stairway and/or fire-doors that are reasonably accessible to disabled residents, or a reliable sprinkler system.

133.    Given that both of the Center's buildings are multistory, the Center's general state of decrepitude, and the significant physical and mental disabilities presented by many of the tenants, there is no facial reason to believe, for example, that

the Center contains sufficiently reliable and safe fire exits; that Young Management has provided the residents with regular fire-drill sessions, if any at all; that accessibility has been sufficiently tailored, if at all, to the disabilities presented by the occupants, generally or specifically; that the Center contains a reliable, well-tested sprinkler or fire-alarm system; and, generally, in the case of a major fire emergency, that the Center would not be a tinderbox with numerous residents effectively trapped and unlikely to survive.

134.    To wit, as these pictures from the Center help reveal, the buildings are poorly maintained, filled with old materials, and devoid of impediments to the spread of fire:





135.    Again, Defendants' behavior in this regard has been wanton as it has exploited the residents' evident vulnerability—e.g., low income and dearth of alternative housing, lack of mobility, long Section 8 waiting lists—to subject them to dangerous living conditions.

<u>**Lack of Reasonable Accommodations**</u>

136.    Federal statutes, including but not necessarily limited to the ADA, Fair Housing Act, and Rehabilitation Act of 1973, provide protections for disabled individuals vis-à-vis housing.

137.   Generally, as further described below, these statutes rely on the provision of "reasonable accommodations" to reduce barriers for the disabled.

138.   The ADA defines "disability" as a physical or mental impairment that substantially limits one or more major life activities; a record of such impairment; or being regarded as having such an impairment. 42 U.S.C. § 12102(1). The FHA defines "handicap" in the same way. 42 U.S.C. § 3602(h).

139.   Plaintiff Donald Coe, given his two spinal conditions, has a "disability" and "handicap" for the purposes of the ADA and FHA.

140.   Plaintiff Linda Smith, given her greatly limited mobility—again, she requires a wheelchair and walker following back surgery— has a "disability" and "handicap" for the purposes of the ADA and FHA.

141.   Many of the Center's other residents have a "disability" and "handicap," whether physical or mental.

142.   As described above, Defendants have overwhelmingly relied on federal assistance as to the Center. The Corporation, whose sole business seems to be owning the Center, has realized approximately $1.2 million in annual revenues, while Young Management specializes in Section 8 housing. Despite having knowledge of the ADA and FHA's requirements, as well as the resources to make any number of accommodations for the disabled, Defendants have brazenly neglected those requirements even while continuing to harvest federal funds.

## COVID-19 TOLLING OF STATUTES OF LIMITATION

143.   Pursuant to multiple orders issued by Chief Justice Luckert of the Supreme

Court of the State of Kansas, Plaintiffs hereby plead that time calculation for any and all statutes of limitation or other time standards governing the state-law claims in this Complaint should be tolled because of the novel coronavirus.

144.    On March 30, 2021, Chief Justice Luckert filed administrative order 2021-PR-020, which compelled, "Deadlines and time limitations (including statutes of limitation statutory time standards) suspended under this order and my prior administrative orders" to resume on April 15, 2021.

145.    Incorporating by reference such previous orders, 2021-PR-020 thereby restored, as of April 15, 2021, the regular calculation of time for limitations on civil causes of action, which had been tolled as of March 19, 2020, when Senate Bill 102 was published in the Kansas Register.

146.    Chief Justice Luckert's orders thereby tolled such time calculation in Kansas courts from March 19, 2020, through April 14, 2021.

147.    Therefore, time calculation for Plaintiffs' state-law claims was tolled from March 19, 2020, through April 14, 2021.

## CLASS-ACTION ALLEGATIONS

148.    Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiffs bring this action on behalf of themselves and the following proposed "Habitability Class":

*All persons who resided at the Center on or after the date five years prior to the filing date of this complaint through the date the Class is certified.*

149.    "Class Period" shall thus be defined as the five years prior to and through the date a Habitability Class is certified.

150.    Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiffs further propose to represent

the following "Protected Consumer Sub-Class":

*All members of the Habitability Class who are, or were at the time of their residence at the Center, over the age of 60, a veteran, the surviving spouse of a veteran, a member of the military, an immediate family member of a member of the military, and/or disabled within the meaning of K.S.A. 50-676(b).*

151.    Pursuant to Fed. R. Civ. P. 23(b)(2), Plaintiffs propose to represent the following "Habitability Injunction Class":

*All persons who currently reside at the Center.*

152.    Pursuant to Fed. R. Civ. P. 23(b)(2) and 42 U.S.C. §§ 2000a-3, 12188(a)(2), Plaintiffs bring this action on behalf of themselves and the following proposed sub-class (the "ADA Injunctive Class"):

*All persons who reside at the Center as of the date of certification of this class and present a "disability" under the ADA.*

153.    Pursuant to Fed. R. Civ. P. 23(b)(2), Pursuant to Fed. R. Civ. P. 23(b)(3),  and 42 U.S.C. §§ 3613(a)(1)(A), 3613(c), Plaintiffs bring this action on behalf of themselves and the following proposed sub-class (the "FHA Class"):

*All persons who reside at the Center as of the date of certification of this Class and present a "handicap" under the FHA.*

154.    Excluded from the proposed Classes are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer, director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned; that judge(s)' spouse; and members of the judge or judges' staff(s).

155.    **Numerosity**. As stated, the Center is capable of housing approximately three-hundred individuals; its current tenant population is in the hundreds of people.

The Center has also realized some significant level of resident turnover. Thus, the proposed Class certainly comprises hundreds of members and may comprise over a thousand. Further, as to the ADA and FHA sub-classes, because a substantial portion of the proposed Class members have a "disability" and "handicap," numerosity will be met with regard to the sub-classes as well.

156.   **Commonality and Predominance**.  Common questions of law and fact exist as to all proposed Class members and predominate over questions affecting only individual Class members. These common questions include:

    i.   Whether Defendants adequately maintained the Center's common areas during the Class Period;

    ii.   Whether the Center's common areas violated habitability standards during the Class Period;

    iii.   Whether Class members were subjected to such violations (e.g., bed bugs, rodents, mold, flooding/leaking) during the Class Period;

    iv.   Whether Defendants have been negligent with regard to their ownership and management of the Center; and

    v.   Whether Plaintiffs and Class members are entitled to injunctive relief, monetary damages, restitution, punitive damages, declaratory relief, or other remedies.

Further, with the exception of the claims as applied to Plaintiffs' individual apartment units, Plaintiffs' class-action claims are literally common in that they pertain to common areas and/or the Center as a whole. For instance, the walls between units are shared walls, representing common areas through which bed bugs, rodents, and other problems spread.

87.   **Typicality**.  Plaintiffs' claims are typical of the claims of members of the

proposed Class. Plaintiffs and the members of the proposed Class all lived at the Center during the Class Period and were subjected to its common areas.

88.     **Adequacy**.   Plaintiffs are adequate representatives of the proposed Class because their interests do not conflict with the interests of the members of the Class they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class-action litigation, and will prosecute this action vigorously on the Class members' behalf.

89.     **Superiority**.   A class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if Class members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from the same issues, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

90.     In the alternative, the proposed Class may be certified because:

    i.     The prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Defendants;

    ii.     The prosecution of individual actions could result in adjudications that, as a practical matter, would be dispositive of the interests of non-party Class

members or which would substantially impair their ability to protect their interests; and

iii.    Defendants have acted or refused to act on grounds generally applicable to the proposed Class, thereby making appropriate final and injunctive relief with respect to the members of the proposed Class as a whole.

## COUNT I:
## INJUNCTIVE RELIEF: CONDITION OF THE BUILDINGS
*Plaintiffs individually and on behalf of the Habitability Injunction Class against both Defendants*

157.    Plaintiffs incorporate by reference all the foregoing paragraphs as though fully reiterated herein.

158.    Plaintiffs bring this Count I individually and on behalf of the Habitability Injunction Class.

159.    Plaintiffs bring this Count I on behalf of the Habitability Injunction Class as to the Center's common areas, which include the walls between units, exterior walls, roof, hallways, elevators, and all other parts of the Center which are not entirely and exclusively located within any single apartment unit.

160.    Plaintiffs bring this Count I individually as to their apartment units.

161.    As a result of Defendants' actions and/or inactions, as alleged herein, Plaintiffs and all Habitability Class members have suffered and will continue to suffer severe and irreparable harm and injury to their health, safety, security, and well-being because of the state of the Center's common areas.

162.    Such harm greatly outweighs any conceivable damage to Defendants that could arise from an injunction.

163.    An injunction would fall squarely within the public interest with regard to

enforcing basic habitability standards and holding entities that rely on federal funds accountable for their behavior as to a highly vulnerable population.

164.    The Court has the power to grant injunctive relief pursuant to its inherent equitable powers; K.S.A. § 58-2559(b); K.S.A. § 50-634(a)(2); and Fed. R. Civ. P. 65.

165.    Therefore, Plaintiffs ask this Court to enter a preliminary and/or permanent injunction against Defendants, ordering them to:

a.  remedy the infestation problems (i.e., bed bugs, rodents, cockroaches, and any other pest) immediately by retaining third-party pest-control professionals;

b.  retain a professional, third-party mold inspector to immediately and thoroughly test the Center for potentially dangerous mold strains and/or concentrations and, in the event the inspector obtains positive tests for such strains and/or concentrations, retain a suitable, third-party professional to remediate such mold problems;

c.  immediately install fire-escape routes and fire-prevention mechanisms (e.g., extinguishers, firewalls/tape, push-button doors) suitable for an elderly, largely disabled resident population and provide all residents with substantially plain fire-escape plans and drills in that regard;

d.  immediately retain a professional, third-party fire inspector to consult with regard to the aforementioned fire-escape measures; immediately retain a third-party, professional HVAC specialist to test the Center's HVAC systems and clean them;

e.   immediately retain a third-party, professional commercial roofer to inspect the Center's roofs (Phase I and Phase II) and, to the extent necessary, remediate substantial problems with those roofs, including the possibility of a wholesale replacement of either or both roofs; immediately retain a professional, third-party plumber to inspect the Center's water lines, including but not limited to the main-line "stacks," as well as other sources of significant flooding, leaking, and/or moisture at the Center and, to the extent necessary, remediate substantial problems in that regard;

f.   immediately retain a third-party, professional elevator inspector to inspect all the Center's elevators and, to the extent necessary, remediate substantial problems with those elevators;

g.   immediately provide significantly enhanced security measures for the Center, such as a dedicated security guard or guards, functioning security cameras and monitoring thereof, and an entry gate to the Center's parking lot(s); and,

h.   to bring the Center into compliance vis-à-vis the tenants' lease agreements and all applicable building, property maintenance, fire, plumbing, mechanical, electrical, and habitability statutes and codes.

166.   Plaintiffs respectfully request that any such injunctive relief "run with the land" and be binding upon Defendants' successors-in-interest and assignees.

167.   Plaintiffs and the Habitability Injunctive Class have no other adequate

remedy at law.

## COUNT II:
## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT
### (42 U.S.C. § 12181 *et seq.* ("Title III"))
*Plaintiffs individually and on behalf of the ADA Injunctive Class*
*against both Defendants*

168.    Plaintiffs incorporate by reference all the foregoing paragraphs as though fully reiterated herein.

169.    Plaintiffs bring this Count II individually and on behalf of the ADA Injunctive Class.

170.    Plaintiffs bring this Count II on behalf of the ADA Injunctive Class as to the Center's common areas, which include the walls between units, exterior walls, roof, hallways, elevators, and all other parts of the Center that are not entirely and exclusively located within any single apartment unit.

171.    Plaintiffs bring this Count II individually as to their apartment units.

172.    Title III of the ADA proscribes, generally, discrimination against the disabled in the provision of public services, including those provided by private entities.

173.    As described, the Center has had as its purpose—since inception—the provision of housing for the "elderly."

174.    As described, the Center is overwhelmingly reliant on federal assistance, primarily in the form of HUD Section 8 vouchers, and is likewise subject to HUD inspections.

175.    As described, Young Management does business across at least four states and Section 8 vouchers provide an important source of revenue for the company.

176.    HUD funds ultimately flow from Washington, D.C., to regional HUD centers such that the Center's operations affect commerce among the states.

177.    Thus, the Center is a "public accommodation" because it is a "senior citizen center" whose operations "affect commerce." *See* 42 U.S.C. §§ 12181(1)(A), (7)(K).

178.    Defendants are both "private entities." *See* 42 U.S.C. § 12181(6).

179.    Defendants, respectively, own and operate the Center.

180.    Title III prohibits the failure by public accommodations "to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(2)(A)(ii).

181.    Defendants' failure to make reasonable modifications and/or accommodations at the Center includes, but is not limited to, declination to enhance common security measures (e.g., better exterior lighting, a dedicated security guard, a gate to better secure the parking lot, reliable monitoring of entrances/exits at the Center); timely treat flooding, leaking, and/or dampness in common areas; provide push-button entry for common doorways; remediate mold, mildew, and/or bacteria in common areas; provide reasonable procedures, including accessible exit-ways, in the case of fire; provide reasonably enhanced measures for fire prevention given the relative immobility of the Center's population; assign units in a reasonable manner relative to tenants' disabilities; remediate bed bugs in common areas; provide services, such as transportation services

(e.g., a common shuttle bus/van for errands) reasonably tailored to the needs of the disabled; offer the option of walk-in showers for mobility-constrained tenants; adequately maintain the Center's elevators; construct ramps so that all of the Center's common areas are fully accessible to those in wheelchairs or with other mobility constraints; control rodents and timely remove the bodies of dead rodents; and failure to install lighting, switches, outlets, and/or appliance controls geared towards the disabled.

182.   As described, some of these reasonable measures pertain to fundamental habitability issues (e.g., bed bugs, rodents, leaking), yet these have an outsized impact on the disabled—for example, puddles in common hallways are broadly unsightly and dangerous, but markedly more so for those with, for example, arthritis or an artificial hip.

183.   Plaintiff Donald Coe has a "disability" because of, respectively, two spinal conditions (i.e., each condition constitutes a "disability").

184.   Mr. Coe has encountered difficult conditions throughout the Center that have included inadequate security measures, bed bugs, mold, cockroaches, water leaks, rodents, and HVAC issues.

185.   Mr. Coe has requested accommodations be made as to, at least, security measures, bed bugs, and flooding/leaking/dampness problems.

186.   As described, Plaintiff Linda Smith has a "disability" because of her immobility.

187.   Mr. Smith has requested accommodations be made as to, at least, her assigned unit and related accessibility, as described, automated doorways suitable for someone in a wheelchair or using a walker, and bed bugs.

188.   Pursuant to 42 U.S.C. § 12188(a)(1), Plaintiffs have available to them the remedies provided by 42 U.S.C. § 2000a-3 for Defendants' ADA violations.

189.   Pursuant to 42 U.S.C. § 12188(a)(2), Plaintiffs have available to them injunctive relief as to Defendants' ADA violations, which injunction "**shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities** . . . ." (emphasis added).

190.   Plaintiffs and the ADA Injunctive Class have no other adequate remedy at law.

191.   Pursuant to 42 U.S.C. § 2000a-3(b), should Plaintiffs and the ADA Injunctive Class prevail on this claim, the Court may award them reasonable attorneys' fees.

192.   Therefore, Plaintiffs respectfully request that the Court enter an order enjoining Defendants from continued ADA violations, as described, by compelling them to alter the Center so that it is "readily accessible to and usable by individuals with disabilities." Plaintiffs request that such order comprise many or all the alterations listed in ¶ 165. Plaintiffs also request that the Court award them reasonable attorneys' fees.

193.   Plaintiffs further request that any such injunctive relief "run with the land" and be binding upon Defendants' successors-in-interest and assignees.

## COUNT III:
## VIOLATIONS OF THE FAIR HOUSING ACT
### (42 U.S.C. § 3601 *et seq.*)
*Plaintiffs individually and on behalf of the FHA Class*
*against both Defendants*

194.   Plaintiffs incorporate by reference all the foregoing paragraphs as though fully reiterated herein.

195. Plaintiffs bring this Count III individually and on behalf of the FHA Class.

196. Plaintiffs bring this Count III on behalf of the FHA Class as to the Center's common areas, which include the walls between units, exterior walls, roof, hallways, elevators, and all other parts of the Center which are not entirely and exclusively located within any single apartment unit.

197. Plaintiffs bring this Count III individually as to their apartment units.

198. The federal Fair Housing Act ("FHA") prohibits discrimination in the sale and leasing of housing.

199. "Discrimination" includes "a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be necessary to afford such person full enjoyment of the premises . . . ." 42 U.S.C. § 3604(f)(1)(3)(A).

200. "Discrimination" includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling . . . ;" 42 U.S.C. § 3604(f)(1)(3)(B).

201. The Center is a "dwelling" for the FHA's purposes because it was designed for occupancy by one or more families. 42 U.S.C. § 3602(b).

202. "Handicap" means a physical or mental impairment that substantially limits one or more major life activities; a record of such impairment; or being regarded as having such an impairment. 42 U.S.C. § 3602(h). Again, Plaintiffs each present multiple "handicaps" for the FHA's purposes.

203.    The FHA, 42 U.S.C. § 3604, generally proscribes discrimination in the sale and leasing of housing because of a person's handicap.

204.    Pursuant to 42 U.S.C. § 3613(a), an "aggrieved person" may commence a civil action in district court within two years following "the occurrence or the termination of an alleged discriminatory housing practice, . . . ."

205.    Pursuant to 42 U.S.C. § 3602(i), Plaintiffs, as well as all proposed FHA Class members, are "aggrieved persons" because they have been injured by a discriminatory housing practice.

206.    As described throughout, Defendants have failed to make numerous reasonable modifications and/or accommodations within the past two years. Defendants' failure to make reasonable modifications and/or accommodations at the Center during the past two years includes, but is not limited to, declination to enhance common security measures (e.g., better exterior lighting, a dedicated security guard, a gate to better secure the parking lot, reliable monitoring of entrances/exits at the Center); timely treat flooding, leaking, and/or dampness in common areas; provide push-button entry for common doorways; remediate mold, mildew, and/or bacteria in common areas; provide reasonable procedures, including accessible exit-ways, in the case of fire; provide reasonably enhanced measures for fire prevention given the relative immobility of the Center's population; assign units in a reasonable manner relative to tenants' disabilities; remediate bed bugs in common areas; provide services, such as transportation services (e.g., a common shuttle bus/van for errands) reasonably tailored to the needs of the disabled; offer the option of walk-in showers for mobility-constrained tenants;

adequately maintain the Center's elevators; construct ramps so that all of the Center's common areas are fully accessible to those in wheelchairs or with other mobility constraints; control rodents and timely remove the bodies of dead rodents; and failure to install lighting, switches, outlets, and/or appliance controls geared towards the disabled.

207.    As described, some of these reasonable measures pertain to fundamental habitability issues (e.g., bed bugs, rodents, leaking), yet these have an outsized impact on the disabled—for example, puddles in common hallways are broadly unsightly and dangerous, but markedly more so for those with, for example, arthritis or an artificial hip.

208.    Defendants have thereby violated, repeatedly, the FHA, 42 U.S.C. § 3602(f)(2), as to Plaintiffs and the FHA Class during the two years prior to the filing of this complaint.

209.    Pursuant to 42 U.S.C. § 3613(c)(1), the Court may grant Plaintiffs a permanent injunction, temporary injunction, temporary restraining order, or other such relief as the Court finds appropriate.

210.    An order in this regard may also compel "affirmative action" by Defendants.

211.    Pursuant to 42 U.S.C. § 3613(c)(2), the Court may grant Plaintiffs, should they prevail on their FHA claim, reasonable attorneys' fees and costs.

212.    Plaintiffs and the FHA Class respectfully request that the Court enter an order enjoining Defendants from continued FHA violations, as described, by compelling them to alter the Center so that it is readily accessible to and usable by individuals with disabilities. Plaintiffs request that such order comprise many or all the alterations listed

in ¶ 165.

213.    Plaintiffs and the FHA Class have no other adequate remedy at law.

214.    Plaintiffs respectfully request that any such injunctive relief "run with the land" and be binding upon Defendants' successors-in-interest and assignees.

**COUNT IV:**
**VIOLATIONS OF THE WARRANTY OF HABITABILITY**
*Plaintiffs individually and on behalf of the Habitability Class*
*against both Defendants*

215.    Plaintiffs incorporate by reference all the foregoing paragraphs as though fully reiterated herein.

216.    Plaintiffs bring this Count IV individually and on behalf of the Habitability Class.

217.    Plaintiffs bring this Count IV individually as to their apartment units.

218.    Plaintiffs and the members of the Habitability Class entered into lease agreements with Young Management, which has managed the Center on behalf of the Corporation.

219.    One of the express and/or implied terms of those contracts was that Defendants would provide living quarters that were, and would remain, habitable. (*Love v. Monarch Apartments*, 13 Kan. App. 2d 341, 345 (Kan. Ct. App. 1989)).

220.    Defendants, by permitting bed-bug infestations, rodent infestations, cockroach infestations, persistent flooding/leaking/dampness, persistent HVAC issues (including filthy HVAC systems), and persistent, excess mold and mildew in common areas, have violated (many times over) §§ 8-432, 17-61-63,  19-225, and 19-238.

221.    In so doing, Defendants have breached the lease agreements. (*Id.*).

222.    Plaintiffs and the Habitability Class are therefore entitled to recover their actual damages, which is the difference between the fair market rental value of the units as they "should have been" and the fair market rental value of the units as they "actually [were]." (*Id.*).

223.    Plaintiffs and the Habitability Class are also entitled to recover consequential damages. (*Id.* at 345-46).

224.    Plaintiffs and the Habitability Class also seek to recover the monthly voucher payments HUD made to Defendants during the Class Period.

225.    Defendants' breach of the warranty of habitability is ongoing and has been extant for years.

226.    Plaintiffs and the Habitability Class have suffered, and will continue to suffer, actual damages from Defendants' violations of the warranty of habitability as to the Center's common areas, which damages include, but are not limited to, bites, welts, rashes, and/or abrasions; and emotional distress, anxiety, loss of sleep, pain and suffering, and/or exacerbation of preexisting conditions.

227.    Defendants' conduct, as alleged herein, was intentional, willful, wanton, fraudulent, and reckless and is ongoing, thereby entitling Plaintiffs and the Habitability Class to punitive damages.

228.    Therefore, Plaintiffs, individually and on behalf of the Habitability Class, ask this Court to enter judgment in their favor and against Defendants for their actual damages, consequential damages, punitive damages, pre-and-post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and

proper under the circumstances described herein.

229.    As outlined above, Plaintiffs propose that this Count IV be certified for class treatment as to all issues other than causation and damages.  Plaintiffs propose that, after resolution of the class issues, they and the class members proceed to individual trials on causation and damages, including punitive damages.

**COUNT V:**
**BREACH OF CONTRACT AND STATUTORY DUTY TO MATERIALLY COMPLY**
**WITH LEASE AND TO PROVIDE HABITABLE HOUSING**
**(K.S.A. § 58-2559(b))**
*Plaintiffs individually and on behalf of the Habitability Class*
*against both Defendants*

230.    Plaintiffs incorporate by reference all the foregoing paragraphs as though fully reiterated herein.

231.    Plaintiffs bring this Count V individually and on behalf of the Habitability Class.

232.    Plaintiffs bring this Count V individually as to their apartment units.

233.    K.S.A. § 58-2559(b) allows tenants to recover damages for a landlord's noncompliance with a rental agreement or K.S.A. § 58-2553.

234.    K.S.A. § 58-2553(a)(1) requires landlords to comply with applicable building and housing codes materially affecting health and safety.

235.    Defendants, by permitting bed-bug infestations, rodent infestations, cockroach infestations, persistent flooding/leaking/dampness, persistent HVAC issues (including filthy HVAC systems), and persistent, excess mold and mildew in common areas, have violated (many times over) §§ 8-432, 17-61-63,  19-225, and 19-238.

236.    The germane rental agreements contain a provision requiring the

47

landlord/manager to exterminate the Center as needed.

237.    By failing to exterminate as needed, Defendants materially failed to comply with the rental agreement.

238.    Plaintiffs, as well as any number of proposed Class members, have given notice to Young Management many times with regard to the infestations described herein.

239.    Pursuant to K.S.A. § 58-2559(a)(1), Plaintiffs, on behalf of themselves and the proposed Habitability Class members, (again) provide notice of their demand to Defendants to remedy the infestations, as well as any other conditions materially breaching Defendants' obligations under the lease agreements.

240.    Pursuant to K.S.A. § 58-2559(b), Plaintiffs and the Habitability Class seek to recover damages in the form of all rents paid by them to Defendants during the Class Period.

241.    Plaintiffs and the Habitability Class also seek to recover the monthly voucher payments HUD made to Defendants during the Class Period.

242.    A contract existed between Plaintiffs (and all other tenants) and Defendants that obligated Plaintiffs and the Habitability Class to pay rent in exchange for housing that conformed to the rental terms contained in that contract.

243.    Plaintiffs and the Habitability Class paid such rent but Defendants failed to provide housing that conformed to the contractual terms. To the extent any of the members of the Habitability Class failed to timely make any rent payments, that failure was justified via the doctrine of constructive eviction.

244. Such agreements obligated Defendants to exterminate as needed, regularly clean common areas, and maintain the common areas and facilities in a safe condition. Defendants failed to meet any of these obligations.

245. These breaches damaged Plaintiffs and the Habitability Class by subjecting them to the afore-described infestations, flooding/leaking/dampness, mold, inadequate HVAC, and generally unclean and unsanitary conditions in the Center's common areas.

246. Defendants' breaches in this regard are ongoing and have been extant for years.

247. Plaintiffs and the Habitability Class have suffered, and will continue to suffer, actual damages from Defendants' breaches of the rental agreements and codes/statutes as to the Center's common areas, which damages include, but are not limited to, bites, welts, rashes, and/or abrasions; and emotional distress, anxiety, loss of sleep, pain and suffering, and/or exacerbation of preexisting conditions.

248. Defendants' conduct, as alleged herein, was intentional, willful, wanton, fraudulent, and reckless and is ongoing, thereby entitling Plaintiffs and the Habitability Class to punitive damages.

249. Therefore, Plaintiffs, individually and on behalf of the Habitability Class, ask this Court to enter judgment in their favor and against Defendants for their actual damages, punitive damages, pre-and-post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper under the circumstances described herein.

250. As outlined above, Plaintiffs propose that this Count V be certified for class

treatment as to all issues other than causation and damages.  Plaintiffs propose that, after resolution of the class issues, they and the class members proceed to individual trials on causation and damages, including punitive damages.

## COUNT VI:
## FAILURE TO PROVIDE ESSENTIAL SERVICES
## (K.S.A. § 58-2563)
*Plaintiffs individually and on behalf of the Habitability Class*
*against both Defendants*

251.    Plaintiffs incorporate by reference all the foregoing paragraphs as though fully reiterated herein.

252.    Plaintiffs bring this Count VI individually and on behalf of the Habitability Class.

253.    Plaintiffs bring this Count VI individually as to their apartment units.

254.    Pursuant to K.S.A. § 58-2563, tenants may recover up to one-and-a-half times the periodic rent for any period during which the landlord/manager deprived them of essential services.

255.    By failing to exterminate as needed, remediate flooding, leaking, dampness, and remediate mold and mildew, Defendants deprived Plaintiffs and the Habitability Class of such essential services.

256.    The extermination of bed bugs, mice, and cockroaches are essential services because infestations by such pests are considered life/health/safety issues under the CODE.

257.    Timely remediating flooding/leaking/dampness, mold and mildew, and HVAC problems are also essential services.

258.   Defendants acted willfully because, as described, they knew of the infestations, flooding/leaking/dampness, mold and mildew, and HVAC problems, and yet did not remediate them, choosing instead to subject tenants to substandard living conditions.

259.   As a result of Defendants' conduct in this regard, Plaintiffs and the Habitability Class have been damaged.

260.   Plaintiffs and the Habitability Class seek to recover damages in the form of all rents paid by them to Defendants during the Class Period.

261.   Plaintiffs and the Habitability Class also seek to recover the monthly voucher payments HUD made to Defendants during the Class Period.

262.   Plaintiffs and the Habitability Class have suffered, and will continue to suffer, actual damages from Defendants' failure to provide essential services as to the Center's common areas, which damages include, but are not limited to, bites, welts, rashes, and/or abrasions; and emotional distress, anxiety, loss of sleep, pain and suffering, and/or exacerbation of preexisting conditions.

263.   Defendants' conduct, as alleged herein, was intentional, willful, wanton, fraudulent, and reckless and is ongoing, thereby entitling Plaintiffs and the Habitability Class to punitive damages.

264.   Therefore, Plaintiffs, individually and on behalf of the Habitability Class, ask this Court to enter judgment in their favor and against Defendants for their actual damages (1.5 x periodic rent), punitive damages, pre-and-post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper

under the circumstances described herein.

265.    As outlined above, Plaintiffs propose that this Count VI be certified for class treatment as to all issues other than causation and damages.  Plaintiffs propose that, after resolution of the class issues, they and the class members proceed to individual trials on causation and damages, including punitive damages.

**COUNT VII:**
**NUISANCE**
*Plaintiffs individually and on behalf of the Habitability Class*
*against both Defendants*

266.    Plaintiffs incorporate by reference all the foregoing paragraphs as though fully reiterated herein.

267.    Plaintiffs bring this Count VII individually and on behalf of the Habitability Class.

268.    Plaintiffs bring this Count VII individually as to their apartment units.

269.    As described, Defendants have repeatedly created and/or maintained uninhabitable living conditions in the form of infestations, flooding/leaking/dampness, mold, HVAC issues, inadequate security, and denial of various reasonable accommodations for the elderly.

270.    Young Management acknowledged that tenants' failure to keep their

**14. HOUSEKEEPING**

Your apartment is your home and keeping it clean is your responsibility. Aside from initial cleaning before you move in management does not shampoo carpets or clean windows, etc., inside your apartment. Periodic inspections will be made by management to ensure that your apartment is clean and pest free. An untidy apartment that creates a nuisance for your neighbors could result in your eviction.

apartments clean could be a nuisance and result in their eviction:

271.    In contrast, even though Defendants have persistently created and/or allowed for nuisances throughout the Center's common areas, they have continued to collect rents from Plaintiffs and the other tenants.

272.    By creating and/or allowing for such nuisances, Defendants have unreasonably interfered with the personal rights and/or property rights of the Center's residents and impaired the residents' ability to enjoy their residences.

273.    This interference has, and continues to, caused damage to Plaintiffs and the other residents.

274.    Plaintiffs and the Habitability Class seek to recover damages in the form of all rents paid by them to Defendants during the Class Period.

275.    Plaintiffs and the Habitability Class also seek to recover the monthly voucher payments HUD made to Defendants during the Class Period.

276.    Plaintiffs and the Habitability Class have also suffered, and will continue to suffer, actual damages from Defendants' failure to provide essential services as to the Center's common areas, which damages include, but are not limited to, bites, welts, rashes, and/or abrasions; and emotional distress, anxiety, loss of sleep, pain and suffering, and/or exacerbation of preexisting conditions.

277.    Defendants' conduct, as alleged herein, was intentional, willful, wanton, fraudulent, and reckless and is ongoing, thereby entitling Plaintiffs and the Habitability Class to punitive damages.

278.    Therefore, Plaintiffs, individually and on behalf of the Habitability Class,

ask this Court to enter judgment in their favor and against Defendants for their actual damages, punitive damages, pre-and-post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper under the circumstances described herein.

279.     As outlined above, Plaintiffs propose that this Count VII be certified for class treatment as to all issues other than causation and damages.  Plaintiffs propose that, after resolution of the class issues, they and the class members proceed to individual trials on causation and damages, including punitive damages.

**COUNT VIII:**
**NEGLIGENCE**
*Plaintiffs individually and on behalf of the Habitability Class*
*against both Defendants*

280.     Plaintiffs incorporate by reference all the foregoing paragraphs as though fully reiterated herein.

281.     Plaintiffs bring this Count VIII individually and on behalf of the Habitability Class.

282.     Plaintiffs bring this Count VIII on behalf of the Habitability Class as to the Center's common areas, which include the walls between units, exterior walls, roof, hallways, elevators, and all other parts of the Center which are not entirely and exclusively located within any single apartment unit.

283.     Plaintiffs bring this Count VIII individually as to their apartment units.

284.     Defendants as, respectively, owner and manager of the Center, owed Plaintiffs and all tenants a duty to exercise reasonable care in providing habitable housing.

285.   Here, such duty included the provision of adequate pest control and maintenance, including but not limited to timely remediating flooding, leaking, dampness, mold and mildew, lax security measures, and filthy HVAC equipment.

286.   Defendants were also negligent in, as stated, failing to have an on-site property manager for a number of months.

287.   Defendants' standard of reasonable care was also heightened because of the relative vulnerability of the Center's residents; the Center was supposed to be a comfortable place for the elderly and disabled and has expressly held itself out as such.

288.   Defendants knew of the Center's unsanitary and outright dangerous conditions.

289.   Nonetheless, Defendants did not disclose such conditions to Plaintiffs and the other tenants. A number of such conditions—e.g., bed-bug infestations, painted-over mold, nocturnal pests, some leaking—were not open and obvious. Defendants had a duty to inspect, warn, and remediate with regard to these conditions.

290.   Defendants breached their duty of reasonable care with respect to, as described, providing pest-control, maintenance, and inspection services and in failing to disclose the Center's poor and/or dangerous conditions to tenants.

291.   These breaches were the direct and proximate causes of injuries to Plaintiffs.

292.   Plaintiffs and the Habitability Class seek to recover damages in the form of all rents paid by them to Defendants during the Class Period.

293.   Plaintiffs and the Habitability Class also seek to recover the monthly voucher payments HUD made to Defendants during the Class Period.

294.    Plaintiffs and the Habitability Class have also suffered, and will continue to suffer, actual damages from Defendants' failure to provide essential services as to the Center's common areas, which damages include, but are not limited to, bites, welts, rashes, and/or abrasions; and emotional distress, anxiety, loss of sleep, pain and suffering, and/or exacerbation of preexisting conditions.

295.    Defendants' conduct, as alleged herein, was intentional, willful, wanton, fraudulent, and reckless and is ongoing, thereby entitling Plaintiffs and the Habitability Class to punitive damages.

296.    Therefore, Plaintiffs, individually and on behalf of the Habitability Class, ask this Court to enter judgment in their favor and against Defendants for their actual damages, punitive damages, pre-and-post-judgment interest at the maximum allowable rate, and any other, further relief the Court may find just and proper under the circumstances described herein.

297.    As outlined above, Plaintiffs propose that this Count VIII be certified for class treatment as to all issues other than causation and damages.  Plaintiffs propose that, after resolution of the class issues, they and the class members proceed to individual trials on causation and damages, including punitive damages.

**COUNT IX:**
**VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT**
*Plaintiffs individually and on behalf of the Habitability Class*
*and Protected Consumer Sub-Class*
*against both Defendants*

298.    Plaintiffs incorporate by reference all facts and allegations contained in the foregoing paragraphs as though fully laid out herein.

299.    The Kansas Consumer Protection Act ("KCPA"), K.S.A. 50-623 *et seq.*, prohibits the use of deceptive and unconscionable acts and practices in connection with consumer transactions in Kansas.

300.    Plaintiffs and the putative class members are each a "consumer" as defined by K.S.A. 50-624(b). Specifically, Plaintiffs and the putative class members each sought and acquired property and/or service—the renting of their respective units—from Defendants.  The residential nature also illustrates that these purchases were necessarily for personal, family, household, business, and/or agricultural purposes.

301.    Defendants are each a "supplier" as defined by K.S.A. 50-624(l). Specifically, each Defendant is a person who, in the ordinary course of business, solicits, engages in, and/or enforces consumer transactions.

302.    The Plaintiffs and the putative class members entered into with Defendants were each a "consumer transaction" in that they represent the lease of property and/or services in Kansas.

303.    The KCPA is to be liberally construed to promote its policies of protecting consumers from suppliers that commit deceptive and unconscionable acts and practices. K.S.A. 50-623; *Williamson v. Amrani*, 283 Kan. 227, 237 (2007).

304.    Defendants' violations of the KCPA include the following:

a.  Willfully concealing, suppressing, and/or omitting the material fact of the presence of the water leaks, in violation of K.S.A. 50-626(b)(3);

b.  Willfully concealing, suppressing, and/or omitting the material fact of the presence of the mold, in violation of K.S.A. 50-626(b)(3);

c. Willfully concealing, suppressing, and/or omitting the material fact of the presence of the bed bugs, in violation of K.S.A. 50-626(b)(3);

d. Willfully concealing, suppressing, and/or omitting the material fact of the presence of the vermin, in violation of K.S.A. 50-626(b)(3);

e. Willfully concealing, suppressing, and/or omitting the material fact of the presence of the fire code violations, in violation of K.S.A. 50-626(b)(3);

f. Willfully concealing, suppressing, and/or omitting the material fact of the presence of the ADA violations, in violation of K.S.A. 50-626(b)(3);

g. Willfully concealing, suppressing, and/or omitting the material fact of the presence of the FHA violations, in violation of K.S.A. 50-626(b)(3);

h. Willfully concealing, suppressing, and/or omitting the material fact of the lack of adequate security, in violation of K.S.A. 50-626(b)(3);

i. Falsely representing, explicitly or implicitly, that the apartments at the Center were safe, clean, and/or in good condition, in violation of K.S.A. 50-626(b)(1)(A), (b)(1)(D), and (b)(1)(G);

j. Taking advantage of the tenants' inability to protect their interests because of their physical and financial infirmities by refusing to provide adequate pest control, in violation of K.S.A. 50-627(b)(1);

k. Taking advantage of the tenants' inability to protect their interests because of their physical and financial infirmities by refusing to timely fix the water leaks, in violation of K.S.A. 50-627(b)(1); and

58

l.   Committing unconscionable conduct by charging and collecting rent from the tenants when the premises are and were uninhabitable, in violation of K.S.A. 50-627(a).

305.   Plaintiffs, individually and on behalf of the Habitability Class, are entitled to recover their actual damages. K.S.A. 50-634(b). Plaintiffs' and the Habitability Class' actual damages include, but are not limited to, the rent they have paid, their emotional distress, and personal injury stemming from, *inter alia*, bed-bug bites.

306.   Plaintiffs and the Habitability Class also seek to recover the monthly voucher payments HUD made to Defendants during the Class Period.

307.   Because Plaintiffs and the class members will be seeking their damages only on an individual basis, they are alternatively entitled to recover civil penalties for each violation of the KCPA pursuant to K.S.A. 50-636, if such civil penalties exceed their actual damages. Should Plaintiffs and the class members prevail on both this KCPA claim and another common law claim, Plaintiffs and the Class Members are entitled to recover both their actual damages and civil penalties, pursuant to *Louisburg Bldg. & Dev. Co., LLC v. Albright*, 45 Kan. App. 2d 618, 665 (Kan. App. 2011).

308.   Plaintiffs, individually and on behalf of the Habitability Class, are also entitled to recover their reasonable costs and attorneys' fees. K.S.A. 50-634(e).

309.   Plaintiffs and the Protected Consumer Sub-Class are also entitled to the recovery of punitive damages. K.S.A. 50-679. As pled in more detail throughout this Complaint, Defendants' conduct is and was intentional, willful, wanton, fraudulent, reckless, and/or malicious, entitling the Protected Consumer Sub-Class to the recovery

of punitive damages.

310.    The KCPA provides for up to $10,000 in civil penalties for each violation, pursuant to K.S.A. 50-636(a).

311.    Further, Plaintiffs and the members of the Protected Consumer Sub-Class are each entitled to the recovery of an enhanced $10,000.00 civil penalty for each violation, pursuant to K.S.A. 50-677.

312.    As outlined above, Plaintiffs propose that this Count IX be certified for class treatment as to all issues other than causation, damages, and civil penalties. Plaintiffs propose that, after resolution of the class issues, they and the class members proceed to individual trials on causation and damages, including punitive damages.

**JURY TRIAL DEMANDED**

313.    Plaintiffs demand a jury trial for all issues so triable.

**DESIGNATION OF PLACE FOR JURY TRIAL**

314.    Plaintiffs designate Kansas City, Kansas, as the place of trial.

Respectfully submitted,

*/s/ Bryce B. Bell*
Bryce B. Bell          KS#20866
Mark W. Schmitz     KS#27538
Andrew Taylor        KS#28542
Jenilee V. Zentrich   KS#29098
BELL LAW, LLC
2600 Grand Blvd., Ste. 580
Kansas City, Missouri 64108
T: 816-886-8206
F: 816-817-8500

Bryce@BellLawKC.com
MS@BellLawKC.com
AT@BellLawKC.com
JZ@BellLawKC.com

Jeffrey M. Lipman
(motion *for pro hac vice* forthcoming)
LIPMAN LAW FIRM, P.C.
8450 Hickman Rd., Ste. 16
Clive, Iowa 50325
T: 515-276-3411
F: 515-276-3736
jeff@lipmanlawfirm.com

Gina Chiala
(motion *for pro hac vice* forthcoming)
Amy Sweeny Davis
(motion *for pro hac vice* forthcoming)
HEARTLAND CENTER
FOR JOBS AND FREEDOM
4044 Central St.
Kansas City, Missouri 64111
ginachiala@jobsandfreedom.org
amysweenydavis@jobsandfreedom.org

***Attorneys for Plaintiffs***