## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DONALD COE, et al.,                                   )
individually and on behalf of themselves              )
and all others similarly situated,                    )
                                                      )
                            Plaintiffs,               )
                                                      )
v.                                                    )         Case No. 22-2047-EFM-ADM
                                                      )
CROSS-LINES RETIREMENT                                )
CENTER, INC., et al.,                                 )
                                                      )
                            Defendants.               )

## MEMORANDUM AND ORDER

This is a putative class action brought by elderly and disabled residents of an apartment complex in Kansas City, Kansas, called Cross-Lines Retirement Center ("Cross-Lines").  The named plaintiffs, Donald Coe, Linda Smith, and Edward Yost, are Cross-Lines residents who allege that the complex owner, Cross-Lines Retirement Center Inc., and its property manager, Young Management Corporation, failed to provide safe and sanitary conditions.  This matter is before the court on defendants' Motion to Compel All Executed Questionnaires.  (ECF 84.) Defendants seek to compel production of questionnaires completed by potential class members. Plaintiffs claim these documents are protected from disclosure by the attorney-client privilege, the common-interest doctrine, and/or the work-product doctrine.  Defendants argue plaintiffs have failed to demonstrate the applicability of these privileges.  For the reasons discussed below, the court finds the questionnaires are protected from disclosure and denies defendants' motion to compel.

I.      **Background**

On September 23, 2021, plaintiffs' counsel—attorneys from Bell Law, LLC ("Bell Law")—conducted a meeting at Cross-Lines regarding residents' living conditions.   Before the meeting, they created a form questionnaire ("the Questionnaire") to distribute to residents.   (ECF 84-2, at 3.)   The two-page Questionnaire began with fields for the residents to provide basic identification information (e.g., resident name, address, unit number) and then included the following sections:

1.   A section to "mark ALL significant problems that you have dealt with at Cross-Lines," with choices such as bedbugs, cockroaches, mice, water leaks, mold, gas problems, and heating problems;

2.   A section to mark if and to whom the resident complained;

3.   A section to "mark ALL health problems that may have been triggered or made worse by the conditions above," with choices such as asthma, lung disease, mobility, mental health, allergies, skin conditions, and digestive problems;

4.   A section to "mark ALL of the following you have for evidence," with choices such as lease papers, photographs, emails or texts from management, medical documents, and recordings; and

5.   A place to "write about your experience while living at Cross-Lines."

(ECF 46-2; ECF 84-2, at 66-67, 72-73.)   A handful of residents attended the meeting.   Plaintiffs' counsel distributed Questionnaires to those residents, some of whom took extra copies to provide to residents who had expressed an interest in meeting with attorneys but were unable to attend. (ECF 84-2, at 3.)   In the month after the meeting, nine residents returned executed Questionnaires to Bell Law.   (*Id.* at 8-9.)

On October 27, Bell Law sent a letter to defendants, informing them that some Cross-Lines residents had retained the firm and intended to pursue a class-action lawsuit, and that defendants

had a duty to preserve relevant information.  (*Id.* at 39-46.)   On October 29, plaintiffs sent defendants a demand letter.   (*Id.* at 32-35.)

On November 1, plaintiffs' attorneys conducted a second meeting at Cross-Lines regarding living conditions at the complex. During the meeting, counsel distributed a slightly modified version of the Questionnaire, which included a new question asking whether the respondent wished to be contacted "about my legal rights."   (*Id.* at 66.)   A few weeks later, counsel distributed the revised Questionnaire to all Cross-Lines residents via a mass mailing.   About thirty residents completed and returned revised Questionnaires to Bell Law.   (*Id.* at 8-9.)

On February 1, 2022, plaintiffs filed their complaint in this case, "on behalf of themselves and others similarly situated," against Cross-Lines Retirement Center Inc. and Young Management Corporation.   (ECF 1, at 1.)   They assert claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the Fair Housing Act,  42 U.S.C. § 3601 *et seq.*, as well as for breach of duties imposed by Kansas common law and statutes.

Around February 4, plaintiffs' counsel slightly revised the Questionnaires again, creating the third iteration.   (*Id.* at 72.)   Six residents completed and returned the third iteration to Bell Law.

Discovery is now underway for the class-certification stage of the case.   (ECF 23.)   In response to June 3 document requests defendants served on each of the named plaintiffs (ECF 26), plaintiffs produced blank copies of the three iterations of the Questionnaire.   Defendants now move to compel production of the completed Questionnaires that Cross-Lines residents returned to plaintiffs' counsel.   Plaintiffs claim these documents are protected from disclosure by the attorney-client privilege, the common-interest doctrine, and/or the work-product doctrine.

## II.       The Questionnaires are Responsive to Document Requests

Although defendants' motion focuses on plaintiffs' privilege assertions over the executed Questionnaires, plaintiffs' response begins by raising the threshold issue of whether the Questionnaires are responsive to defendants' document requests.    Specifically, plaintiffs point out that defendants' motion references "Coe Request Nos. 17 and 18, Smith Request Nos. 12 and 13, and Yost Request Nos. 12 and 13."   (ECF 84, at 1-2.)   These identical requests sought:

- "All advertisements Plaintiff received related to alleged habitability issues at Cross-Lines Retirement Center, Inc.," and

- "All solicitations Plaintiff received related to alleged habitability issues at Cross-Lines Retirement Center, Inc."

(ECF 84-1.)   Plaintiffs now argue that "***responses*** to the questionnaires . . . are not responsive to any of these document requests, which seek only 'advertisements' and 'solicitations' **received by** Coe, Smith, and Yost."   (ECF 94, at 2 (emphasis in original).)

The court deems plaintiffs to have waived this issue by not raising it during the pre-motion discovery conference with the court.   Specifically, the court held two discovery conferences (on September 1 and 23) to explore the extent to which the parties may be able to reach agreement regarding the discoverability of the Questionnaires.   (*See* ECF 61, 64, 75.)   At neither conference did plaintiffs assert a lack of responsiveness as a reason against production.   The court's purpose in conducting pre-motion discovery conferences is to facilitate a discussion of the parties' disputes with the goal of hopefully obviating the need for formal motion practice, or, at a bare minimum, at least narrowing and focusing the issues so as to streamline motion practice.   As such, the court expects parties to use the conferences to focus the discussion on their key arguments.   During the September 1 conference, plaintiffs' counsel mentioned as "background" that "initially [plaintiffs] had not understood these requests to be seeking" executed Questionnaires, but then he went on to

4

assert that the Questionnaires were privileged.  (ECF 83, at 8-9.)  Plaintiffs now raise as their

lead argument that the completed Questionnaires are "nonresponsive" to the discovery requests.

The court will not consider this belated argument, which plaintiffs never meaningfully raised

during the pre-motion discovery conference process so as to give the court and defendants fair

notice that this was likely to be plaintiffs' threshold argument against production.

In any event, the question of whether the documents are responsive to Coe Request Nos.

17 and 18 is academic.  The Questionnaires are clearly responsive to other document requests,

such as Coe Request Nos. 1, 2, and 9-16.  (ECF 84-1, at 2-9.)  The court thus moves on to

consider the actual issue at the heart of this dispute: whether the Questionnaires are privileged.

## III.    Plaintiffs' Privilege Log is Adequate

Before reaching the substantive merits of plaintiffs' privilege assertions, the court will

address defendants' argument that plaintiffs waived these claims by failing to produce an adequate

privilege log.   Under the circumstances here, the court finds this argument to be without merit.

Defendants assert that plaintiffs' privilege log "fails to satisfy the requirements of Fed. R.

Civ. P. 26(b)(5)."  (ECF 84, at 3.)  This rule requires a party who "withholds information

otherwise discoverable by claiming that the information is privileged or subject to protection as

trial-preparation material" to "describe the nature of the documents . . . not produced . . . in a

manner that, without revealing information itself privileged or protected, will enable other parties

to assess the claim."   FED. R. CIV. P. 26(b)(5)(A)(ii).   It does not require the withholding party to

set forth the description in a particular format, but parties generally satisfy its tenets by providing

a privilege log.  *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2017 WL

1106257, at *4 (D. Kan. Mar. 24, 2017) ("Although Fed. R. Civ. P. 26(b)(5)(A) doesn't expressly

require a privilege log, a party withholding information on privilege grounds generally satisfies

the tenets of that rule by providing a privilege log."); *Farha v. Idbeis,* No. 09-1059-JTM, 2010 WL 3168146, at *4 (D. Kan. Aug. 10, 2010) ("Typically, parties satisfy Rule 26(b)(5)(A)(ii) by creating a privilege log describing the date the document was created, the author and receipt, the general reason the communication relates to legal advice or work product and the specific privilege claimed."). On occasion, "a party might satisfy Rule 26(b)(5)(A)(ii) by describ[ing] a particular communication in such narrative detail that a formal privilege log is unnecessary." *Farha*, 2010 WL 3168146, at *4 n.11. Regardless of the format chosen, the withholding party bears the burden of describing the documents in sufficient detail "so that the opposing party and the court can evaluate the claimed privilege." *In re Syngenta*, 2017 WL 1106257, at *5; *see also Farha*, 2010 WL 3168146, at *4 n.11 ("A privilege log is not always necessary as long as the opposing party and the court can assess whether the claimed privilege applies to the document."). The level of detail required is determined on a case-by-case basis. *Kosjer v. Coffeyville Res. Crude Transp., LLC*, No. 17-1181-JTM, 2018 WL 1151515, at *3 (D. Kan. Mar. 5, 2018). "If a party fails to make the required showing . . . the court may deem the privilege waived." *Couser v. Somers*, No. 18-1221-JWB-GEB, 2022 WL 343659, at *6 (D. Kan. Feb. 4, 2022) (quoting *In re Universal Serv. Fund Tel. Billing Pracs. Litig.*, 232 F.R.D. 669, 671 (D. Kan. 2005)); *Fish v. Kobach*, No. 15-9300-JAR-JPO, 2016 WL 893787, at *2 (D. Kan. Mar. 8, 2016) (citing *New Jersey v. Sprint Corp.*, 258 F.R.D. 421, 448 (D. Kan. 2009)).

In this case, plaintiffs produced both a typical privilege log in chart format and an accompanying narrative adding detail to the log. (ECF 84-2.) Plaintiffs also produced unexecuted copies of the three iterations of the Questionnaires that they are withholding, so the "the nature of the documents" is known. The remaining information necessary for the court and defendants to evaluate plaintiffs' privilege claim over each executed Questionnaire, under the

standards set forth below, is (1) the specific privilege asserted, (2) the identity of the resident executing the Questionnaire, (3) the date the Questionnaire was submitted to counsel, and (4) circumstances surrounding the execution and submission that might suggest the resident's purpose in taking those actions.   Plaintiffs' chart sufficiently provides the first three pieces of information, and the narrative provides the fourth.   (*Id.*)   Despite defendants' suggestion otherwise, plaintiffs did not simply make a "blanket claim of privilege."   (ECF 84, at 3.)   And contrary to defendants' argument, plaintiffs were not required to submit affidavits or sworn testimony to satisfy Rule 26(b)(5)(A)(ii).   *See* FED. R. CIV. P. 26(b) advisory committee notes to 1993 amendment ("The rule does not attempt to define for each case what information must be provided when a party asserts a claim of privilege or work product protection."); *City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart, Inc.*, No. 5:12-CV-5162, 2018 WL 1558572, at \*4 (W.D. Ark. Mar. 29, 2018) ("An affidavit is not always required in support of a privilege log."); *BreathableBaby, LLC v. Crown Crafts, Inc*., No. 12-CV-94 PJS/TNL, 2013 WL 3350594, at \*11 (D. Minn. May 31, 2013) ("[T]his Court is unaware of any precedential law or local or federal rule that requires a party to provide such affidavit.").   The court finds that plaintiffs' privilege log, which combines a chart and narrative, to be sufficient to assert privilege and work-product claims under Rule 26(b)(5)(A)(ii).

## IV.   The Questionnaires are Protected by the Attorney-Client Privilege

The court next considers defendants' arguments that plaintiffs have failed to demonstrate that the withheld Questionnaires are protected by the attorney-client privilege.   Plaintiffs' privilege log asserts attorney-client protection over all but one of the withheld Questionnaires (that of Linda Sweet).   (ECF 84-2, at 8-9.)   As explained below, the court concludes that the attorney-client privilege permits plaintiffs to withhold all the Questionnaires over which it is asserted.

Where, as here, plaintiffs assert both federal claims and pendent state claims, the court must consider both federal and state law when deciding questions of attorney-client privilege. *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1369 (10th Cir. 1997). "But when 'no real conflict between federal and Kansas law regarding the attorney-client privilege exists, whether the Court applies federal or Kansas law generally makes no difference in determining whether attorney-client privilege applies.'" *Klaassen v. Univ. of Kan. Sch. of Med.*, No. 13-2561-DDC-KGS, 2016 WL 6138169, at *3 (D. Kan. Oct. 21, 2016) (quoting *C.T. v. Liberal Sch. Dist. USD 480*, Nos. 06-2093-JWL, 06-2360-JWL, 06-2359-JWL, 2008 WL 217203, at *2 (D. Kan. Jan. 25, 2008) (internal modifications omitted)). The court will apply federal law here for clarity and because "no real conflict between federal and Kansas law regarding the attorney client privilege [exists]." *In re Motor Fuel Temp. Sales Pracs. Litig.*, No. 07-MD-1840-KHV, 2010 WL 11431875, at *2 (D. Kan. July 7, 2010). In other words, the court would reach the same conclusion regardless of which body of law it applies.

Under federal common law, the attorney-client privilege protects "confidential communications by a client to an attorney made in order to obtain legal assistance from the attorney in his capacity as a legal advisor." *In re Grand Jury Proc.*, 616 F.3d 1172, 1182 (10th Cir. 2010) (internal quotations omitted); *see also Williams v. Sprint/United Mgmt. Co.*, No. 03-2200-JWL-DJW, 2006 WL 1867478, at *5 (D. Kan. July 1, 2006) ("Under federal common law, the essential elements of the attorney-client privilege are: (1) Where legal advice is sought (2) from a professional legal advisor in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived."). Its purpose "rests on the need for the advocate and counselor to know all that relates to the client's

reasons for seeking representation if the professional mission is to be carried out." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)). "A party claiming the attorney-client privilege must prove its applicability, which is narrowly construed." *United States v. Merida*, 828 F.3d 1203, 1209 (10th Cir. 2016); *see also In re Grand Jury Proc.*, 616 F.3d at 1183 (ruling that the party asserting attorney-client privilege bears the burden to establish that it applies). Applying these factors to the privilege issues here in dispute, the court finds that plaintiffs must establish, first, that the communications at issue were made for the purpose of obtaining legal assistance from a lawyer; and second, that the communications were made in confidence.

As discussed above, plaintiffs have submitted a detailed privilege log accompanied by a narrative in support of their privilege assertions. Through these materials, as explained below, plaintiffs have met their burden to demonstrate these elements of the attorney-client privilege.

### A.     Communications Were Made for the Purpose of Seeking Legal Assistance

First, plaintiffs demonstrate the communications on the Questionnaires were made for the purpose of seeking legal assistance from a lawyer. Plaintiffs' privilege log states that their attorneys specifically created the Questionnaires to gather information about the conditions at Cross-Lines "so that Plaintiffs' counsel could effectively give advice to any tenant(s) at Cross-Lines who sought it." (ECF 84-2, at 3.) The practice of gathering confidential information from prospective clients via a questionnaire is fairly common in cases involving large numbers of clients. *See, e.g., Hudson v. Gen. Dynamics Corp.*, 186 F.R.D. 271, 275 (D. Conn. 1999) ("In actions involving representation of multiple clients like this one, a client questionnaire is often prepared by counsel as an efficient substitute for more time consuming face-to-face interviews to

9

provide the attorney with client information in response to focused questions fashioned by the attorney about the potential client and his or her claims.").

Counsel first shared the Questionnaires at the September 23 meeting that was attended by tenants seeking "legal advice concerning their options, including potential claims, with regards to the conditions at Cross-Lines."   (ECF 84-2, at 3.)   Some of the residents in attendance took extra copies to give other residents "who had already expressed an interest in meeting with attorneys." (*Id.*)   Plaintiffs' counsel next distributed the Questionnaires at a November meeting that was "arranged because Bell Law, LLC had received numerous calls from tenants requesting a meeting."   (*Id.* at 4.)   In preparation for the meeting, Bell Law modified the Questionnaire slightly by adding a question asking whether the respondent wished to be contacted "about [their] legal rights."   (*Id.* at 66.)   Thus, the purpose of the first meeting was to provide legal advice to residents requesting information about their legal options "with regards to the conditions at Cross-Lines," and the similar purpose of the second meeting was to allow "tenants who wished to meet with attorneys to obtain legal advice concerning their options, including potential claims, with regards to the conditions at Cross-Lines Retirement Center [to] do so."   (*Id.* at 4.)   The record therefore reflects that residents who returned Questionnaires obtained from those meetings were seeking legal representation or advice.   *See Vodak v. City of Chicago*, No. 03 C 2463, 2004 WL 783051, at *3 (N.D. Ill. Jan. 16, 2004) (finding attorney-client privilege applied to completed questionnaires distributed at a meeting where "those who were seeking legal representation or specific advice were requested to complete the form questionnaire").

On November 17, Bell Law distributed revised Questionnaires as part of a mass mailing to all residents.   A cover letter accompanying the mailing advised that Bell Law had "conducted an initial investigation" and concluded the building owners were not meeting their "obligation to

maintain the building in a safe and livable manner."   (ECF 84-2, at 65.)   It then stated, "We want

to help.   If you would like to speak with us about your legal rights and options, return the enclosed

questionnaire or simply give us a call."   (*Id.*)   Based on this language, the most reasonable

inference is that residents who returned completed Questionnaires thereafter were doing so in

response to the cover-letters' directive to return it to obtain legal advice.   *See A.C.L.U. Fund of

Mich. v. Livingston Cnty.,* 23 F. Supp. 3d 834, 842 (E.D. Mich. 2014) (holding privileged a mailing

in which cover letter explained the purpose of the mailing was to find out "if you are interested in

meeting with an . . . attorney . . . for the purpose of obtaining legal advice or assistance").

Finally, plaintiffs state that some residents, including Shon Allen and Jonathan Shalinsky,

went to the Bell Law offices seeking legal representation and executed the form while there.   (ECF

84-2, at 4 n.2.)   This presents a clear example of residents seeking legal advice from plaintiffs'

counsel.

Furthermore, plaintiffs' assertion that residents who executed and returned the forms to

plaintiffs' counsel were seeking legal assistance is borne out by the number of residents who both

returned the form and then retained Bell Law as counsel.   Of the 43 executed Questionnaires, 25

of them were completed by residents who have since retained Bell Law, and 17 of the remaining

were completed by residents who have represented that they are seeking Bell Law's representation.

(*Id.* at 8-9.)   Indeed, the privilege log indicates that resident Linda Sweet is the only submitter

who has not either retained Bell Law or expressed a desire to so do.   (*Id.* at 5, 9.)

Defendants do not challenge specific iterations of the Questionnaires or the applicability

of privilege to Questionnaires completed by any specific resident (save for Coe, which is discussed

below).[1]   Rather, defendants argue that plaintiffs have not supported their privilege assertion as to *any* of the Questionnaires because plaintiffs have not shown that residents were seeking legal advice in returning executed Questionnaires to Bell Law.   (ECF 84, at 4.)   Specifically, defendants complain, "Plaintiffs seek to assert an attorney-client privilege to communications involving individuals who had not retained counsel at the time of executing and returning the questionnaires."   (ECF 84, at 2.)   This argument rests on the incorrect assumption that the attorney-client privilege only attaches to communications once a client has retained the attorney.

The attorney-client privilege may attach to confidential communications made before a formal attorney-client agreement is entered.   *See Cole v. Ruidoso Mun. Sch*., 43 F.3d 1373, 1384 (10th Cir. 1994) ("For there to have been an attorney-client relationship, the parties need not have executed a formal contract.").   This often occurs when a person confidentially conveys information to an attorney in seeking the attorney's legal representation.   *See Vodak*, 2004 WL 783051, at *3 (finding attorney-client privilege where "the persons who completed the form questionnaires reasonably believed that they were consulting counsel in their capacity as lawyers and they completed the questionnaire for the purpose of requesting legal representation"); *Hiskett v. Wal-Mart Stores, Inc*., 180 F.R.D. 403, 405 (D. Kan. 1998) (holding "Possible Case Intake" form completed by a prospective client was protected by the attorney-client privilege); 8 CHARLES A. WRIGHT, ET AL., FED. PRAC. & PROC. CIV. § 2017 (3d ed. April 2022 update) ("It is not necessary that an attorney–client relation have actually existed.   One who consults a lawyer with a view to obtaining professional legal services from him or her is regarded as a client for purposes of the

---

[1] As noted above, the three iterations of the Questionnaire were each created, distributed, and returned under slightly different circumstances.   But defendants challenge plaintiffs' privilege claim by lodging the same arguments as to essentially all of the completed Questionnaires rather than attempting to draw any distinctions as to separate residents or categories of residents (again, save Coe's completed Questionnaire), so the court takes the same approach.

privilege.").   Whether the potential client ultimately decides to retain the attorney (or the attorney ultimately agrees to represent the client) is of no consequence; the initial communication remains protected.  *See Westinghouse Elec. Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311, 1319 (7th Cir. 1978) ("The fiduciary relationship existing between lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result."); *Vodak*, 2004 WL 783051, at *4 ("The existence of an attorney-client relationship is not tied to actual employment of the lawyer."); 1 MCCORMICK ON EVID. § 88 (8th ed. July 2022 Update) ("Communications in the course of preliminary discussion with a view to employing the lawyer are privileged though the employment is in the upshot not accepted."). Under these principles, courts consistently hold that questionnaires completed by potential clients seeking legal representation are protected by the attorney-client privilege.  *See Vodak*, 2004 WL 783051, at *3-*4 (holding form questionnaires distributed at a meeting organized to provide legal information and attended by approximately 500 people were protected by the attorney-client privilege when executed and returned to counsel); *Hudson*, 186 F.R.D. at 276 (holding "questionnaires completed by the plaintiffs when they were clients or while attempting to become prospective clients are privileged").

Here, as discussed above, plaintiffs have demonstrated, on balance, that the Questionnaires at issue were returned by residents for the purpose of seeking legal representation and advice. Whether or not a particular resident had actually retained Bell Law at the time of submission is not the determinative consideration.   Defendants' argument is therefore without merit because it rests on an incorrect interpretation of the privilege that is too narrow.

B.      **Communications Were Made in Confidence and the Common-Interest Doctrine Would Apply**

Plaintiffs also have demonstrated that the residents' communications to Bell Law through the Questionnaires were made in confidence.   The privilege log states that plaintiffs' counsel has not shared the executed Questionnaires with anyone; they have been maintained in confidence. (ECF 84-2, at 5.)   Bell Law has not shown any resident the Questionnaire completed by any other resident.   (*Id.*)   In addition, the Questionnaires asked for private information such as residents' social security numbers and health conditions.   "Such information is not normally divulged in the absence of an understanding that it will be held in confidence, and used for the benefit of the informant in safeguarding his legal interests."   *Connelly v. Dun & Bradstreet, Inc.,* 96 F.R.D. 339, 342 (D. Mass. 1982) (finding attorney-client privilege over executed questionnaires that asked for information as to net worth, income, and investment activities).   The court finds that plaintiffs' privilege log adequately demonstrates the communication conveyed through the Questionnaires was intended to be—and was kept—confidential.

Although defendants do not say it in so many words, the overriding thrust of some of their arguments seems to be that the attorney-client privilege either never attached or was waived because some of the residents shared Questionnaires amongst themselves.   For example, defendants point out that Coe testified in his deposition that resident Freda Stewart gave blank Questionnaires to him and Tammy Jordan.[2]   (ECF 84, at 7 (citing ECF 84-6, Coe Dep. at 90:8-92:13).)   And plaintiffs' privilege log indicates that attendees at the September and November meetings took copies of the Questionnaires to "provide other tenants who had already expressed an interest in meeting with attorneys but were unable to attend."   (ECF 84-2, at 3-4.)

---

[2] Plaintiffs have not asserted privilege over any Questionnaire executed by Tammy Jordan. (*See* ECF 84-2, at 8-9.)

The court has found above that, for a number of reasons, residents *executing* the Questionnaires at issue knew they were seeking legal assistance.   It matters not whether they *received* the Questionnaire at a meeting, in the mail, at Bell Law offices, or from another resident after expressing an interest in meeting with an attorney about their legal rights.   But in any event, to the extent any potential class plaintiff shared information on the Questionnaire with any other potential class plaintiff, the court finds the attorney-client privilege remains intact under the common-interest doctrine asserted by plaintiffs.   The common-interest doctrine is an exception to waiver that protects information and documents shared outside the attorney-client relationship. *See Lawson v. Spirit AeroSystems, Inc.,* 410 F. Supp. 3d 1195, 1209 (D. Kan. 2019); *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 362-66 (3d Cir. 2007) (discussing the history and the contours of the joint-client and common-interest doctrines); *see also In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1195 (10th Cir. 2006) ("[T]he 'joint defense' or 'common interest' doctrine provides an exception to waiver . . . .").[3]   To be protected, communications must be made in the course of a "joint effort with respect to a common legal interest" and for the purpose of furthering that effort.   *Lawson*, 410 F. Supp. 3d at 1209 (quoting *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815-16 (7th Cir. 2007)).   Courts have generally required that the nature of the parties' common interest "be identical, not similar, and be legal, not solely commercial."   *Id.* (quoting *Teleglobe Commc'ns*, 493 F.3d at 365).

---

[3] Kansas state courts have not explicitly recognized the common-interest doctrine. However, the court believes that Kansas state courts would follow the weight of authority and apply the doctrine to prevent waiver of attorney-client privilege where parties share a common interest.   *See, e.g.*, *hibu Inc. v. Peck*, No. 16-cv-1055-JTM-TJJ, 2016 WL 6804996, at *5 (D. Kan. Nov. 17, 2016) (applying the common-interest doctrine in a diversity case where Kansas law governed); *Sawyer v. Sw. Airlines*, No. 01-2385-KHV-DJW, 2002 WL 31928442, at *3 (D. Kan. Dec. 23, 2002) (same).

The court has no trouble concluding that the common-interest doctrine would apply here. This is a putative class action in which tenants seek injunctive relief and a finding of liability with regard to all tenants at Cross-Lines.   This is more than a "shared desire to see the same outcome in a legal matter."   Plaintiffs have identical legal interests.   Defendants do not argue to the contrary.

Given the record before it, the court finds that plaintiffs have demonstrated the executed Questionnaires were communications submitted for the purpose of obtaining legal assistance and were submitted and maintained in a confidential manner.   The court upholds plaintiffs' attorney-client privilege objection, where asserted, over the Questionnaires as a whole.[4]

### C.   Coe's Executed Questionnaire is Protected by the Attorney-Client Privilege

As mentioned above, the only Questionnaire defendants separately address is the one executed by Coe (Bates No. 3515).   Defendants argue that plaintiffs have not shown Coe was seeking legal assistance from an attorney in submitting his completed Questionnaire.   (ECF 84, at 8.)   Specifically, defendants note that Coe obtained the Questionnaire from resident Freda Stewart, who suggested that he complete it and return it to her, which he did.   (*Id.*)   Coe testified in deposition that at the time of executing the Questionnaire, he did not know the identity of the law firm involved.   (*Id.* (citing ECF 84-6, Coe Dep. at 113:7-17).)   Defendants further state that Coe did not have an attorney-client relationship at the time he executed the Questionnaire.   (*Id.* (citing ECF 84-6, Coe Dep. at 113:18-24).)   Thus, defendants argue, Coe's Questionnaire was not

---

[4] This holding includes any Questionnaire executed by Linda Smith.   Defendants' reply notes that Smith testified at her deposition that she could not recall completing a Questionnaire. (ECF 102, at 3 (citing ECF 102-2, Smith Dep.).)   If Smith did not submit a Questionnaire to Bell Law, then defendants' motion to compel is moot as to Smith.

a "communication between an attorney and client[, but] was merely a communication between Freda Stewart and Coe."   (ECF 84, at 9.)

Under the legal standards set forth above, the court disagrees with defendants and finds Coe's Questionnaire protected by the attorney-client privilege.   First, the record supports Coe's contention that he was seeking attorney assistance when he delivered his executed Questionnaire to Stewart.   Coe was clear in his deposition that he executed the Questionnaire at the behest of a law firm.   He testified that he had heard "there was a questionnaire going around and there was a possible lawsuit."   (ECF 84-6, Coe Dep. at 90:8-17.)   As a result, he asked Stewart "if [he] could see the questionnaire, and she gave [him] a copy."   (*Id.* at 90:17-18.)   Coe testified that Stewart told him "that the law firm that she filed a lawsuit with gave her a copy of it for people that wanted to fill it out."   (*Id.* at 91:9-11.)   Although Stewart may not have told Coe the name of the firm,[5] she told him that if he completed the questionnaire, she would give it to the firm.   (*Id.* at 91:9-14; 112:17-113:17.)   Thus, Coe knew that submitting the Questionnaire to Stewart was essentially submitting it to an attorney who had or would bring suit.   Whether Coe knew the name of the attorney at the time is not significant.   Moreover, under the common-interest doctrine discussed above, using Stewart as a conduit to deliver the Questionnaire did not destroy the confidentiality of Coe's communication to the attorney.   Finally, the fact that Coe "didn't sign anything with the law firm at the time" he submitted his executed Questionnaire (ECF 84-6, Coe Dep. 113:18-24) is of no relevance.   As explained above, a formal attorney-client agreement need not be executed for an attorney-client relationship to exist.   *Cole*, 43 F.3d at 1384; *Vodak*, 2004 WL 783051, at *4; *Hiskett*, 180 F.R.D. at 405; *Westinghouse*, 580 F.2d at 1319.

---

[5] Coe testified that he has Bryce Bell's business card, but he gave inconsistent testimony about whether Stewart gave him the card at the same time as the Questionnaire.   (ECF 84-6,  Coe Dep. at 104:4-12; 113:11-17.)

Because plaintiffs have demonstrated that the elements of attorney-client privilege apply to Coe's Questionnaire, they need not produce it.   Defendants' motion is denied as to this issue.

## V.   Sweet's Questionnaire is Protected by the Work-Product Doctrine

The court next turns to defendants' argument that the executed Questionnaires are not protected work product.   Because the court has found the attorney-client privilege protects all Questionnaires over which it was asserted, the court need only consider whether the one remaining Questionnaire, executed by Linda Sweet (Bates No. 3614), is protected work product.

The work-product doctrine was first recognized in *Hickman v. Taylor* when the Supreme Court found that to prepare for trial, an attorney must "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference."   329 U.S. 495, 511 (1947).   The doctrine is now codified in Federal Rule of Civil Procedure 26(b)(3).   That rule provides that a party ordinarily "may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."   FED. R. CIV. P. 26(b)(3).   Thus, in order to establish work-product protection, the party asserting it must show that (1) the materials sought are documents or tangible things, (2) prepared by or for the party or its representative, and (3) prepared in anticipation of litigation or for trial.   *Id.*; 8 CHARLES A. WRIGHT, ET AL., FED. PRAC. & PROC. § 2024 (3d ed. 2019).   Like the attorney-client privilege, the party asserting work-product protection bears the burden to demonstrate it applies.   *In re Grand Jury Proc.*, 616 F.3d at 1185; *Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir. 1984).

Sweet's executed Questionnaire meets the first element of work product inasmuch as it is a document, which leaves plaintiffs with the burden of demonstrating only the latter two elements.

18

Sweet is not a party, nor has she requested to become a party, to this litigation.   (ECF 84-2, at 9.) Rather, Sweet is a fact witness who provided her statements to plaintiffs' counsel through the Questionnaire.   Plaintiffs assert that "witness statements are protected work product" when an attorney gathers them "in anticipation of, or in conjunction with, litigation."   (ECF 94, at 9.) Defendants dispute this claim, arguing that "[f]actual statements from witnesses to questions which have been disclosed to the public do not constitute [the] mental processes" of an attorney that the rule was designed to protect.   (ECF 84, at 9.)

Case law supports plaintiffs' position.   Courts have persuasively held that witness answers to questionnaires distributed by attorneys in the context of imminent litigation are protected work product.   *See, e.g., Connelly*, 96 F.R.D. at 342 ("Questionnaires sent to individuals for the purpose of assisting an attorney in giving legal advice in the context of imminent litigation are 'work product.'"); *In re Grand Jury Investigation*, 599 F.2d 1224, 1229–30 (3d Cir. 1979) (upholding finding that witness-returned factual questionnaires used by counsel were protected work product); *In re Grand Jury Subpoena*, 599 F.2d 504, 512 (2d Cir. 1979) (holding "written answers to the questionnaires set out in the employee's own words . . . [are] part of the lawyer's work product"). *See also Hickman*, 329 U.S. at 512 (holding witness statements that attorney gathered were protected work product).   Such questionnaires, and a witness's answers to the same, are "in furtherance of the attorney's duty to investigate the facts in order to advise the . . . client in anticipation of litigation."   *In re Grand Jury Subpoena*, 599 F.2d at 510.   Additionally, responses to questionnaires "aid counsel in determining which witnesses should be called and the relevancy, materiality and effect of their testimony if they were to be called."   *United States v. Deere & Co.*, 9 F.R.D. 523, 528 (D. Minn. 1949).

Here, plaintiffs have demonstrated that their attorneys prepared the Questionnaire to aid them in litigating this case and that Sweet completed it to return to the attorneys. The Questionnaire gathered facts about complained-of conditions at Cross-Lines. It gathered information about potential damages caused by the conditions. And it asked Sweet to identify any "evidence" she possessed. Moreover, litigation was imminent at the time counsel distributed the revised Questionnaire to Sweet. Before plaintiffs' counsel distributed the blank Questionnaire, they had sent defendants both a preservation letter and a demand letter. (ECF 84-2, at 11-62.) In fact, plaintiffs filed this lawsuit just two days after Sweet returned the Questionnaire. Based on these facts, the court finds that Sweet's executed Questionnaire is protected work product.

Although Rule 26(b)(3) permits discovery of protected work product if the requesting party shows that it has a "substantial need" and inability to obtain the equivalent without "undue hardship," defendants do not suggest that either of these circumstances apply here. Moreover, defendants do not argue that work-product protection has been waived as to Sweet's Questionnaire. Indeed, any such argument likely would be unsuccessful because the record does not reflect that any person revealed Sweet's Questionnaire "to an adversary or a conduit to an adversary," as would be required for the court to find work-product waiver. *Pipeline Prods., Inc. v. Madison Cos.*, No. 15-4890-KHV-ADM, 2019 WL 2106111, at *3 (D. Kan. May 14, 2019); *SEC v. Herrera*, 324 F.R.D. 258, 262 (S.D. Fl. 2017) ("In the context of work product, the question is not, as in the case of attorney-client privilege, whether confidential communications are disclosed, but to whom the disclosure is made—because the protection is designed to protect an attorney's mental processes from discovery by adverse parties."); *United States v. Deloitte LLP*, 610 F.3d 129, 139 (D.C. Cir. 2010) (noting that although the attorney-client privilege is waived

by voluntary disclosure, work-product protection is only waived by voluntarily disclosure to an adversary).   As such, the work-product doctrine protects Sweet's Questionnaire from disclosure.

As a final matter, the court addresses defendants' assertion that "underlying facts" conveyed in the Questionnaires are not protected.  (ECF 102, at 4.)  To this there can be no dispute.  *See Upjohn*, 449 U.S. at 395; *Vodak*, 2004 WL 783051, at *4 ("It is true that only the communications and advice given are privileged; the facts communicated are still discoverable if otherwise the proper subject of discovery." (internal citation and quotation omitted)).  But this recognized rule does not entitle defendants to view the protected Questionnaires themselves.  *See High Tech Commc'ns, Inc. v. Panasonic Co.,* No. CIV. A. 94-1477, 1995 WL 83614, at *4 (E.D. La. Feb. 24, 1995) ("[A] document does not lose its work product status merely because it contains discoverable factual information.").   Rather, defendants are at liberty to seek factual information from plaintiffs in discovery (such as through interrogatories and depositions) and from non-party witnesses through their own questionnaires or interviews.  *See, e.g., id.* ("Panasonic can discover any facts disclosed in the questionnaires by deposing the individuals who responded to them."); *Deere & Co.,* 9 F.R.D. at 528 ("The names and addresses of [witnesses] canvassed by the plaintiff are known to the defendants. Similar questionnaires may be submitted by defendants to them if they so desire.").

In sum, the court finds that plaintiffs have supported their privilege and work-product assertions over the Questionnaires.

**IT IS THEREFORE ORDERED** that defendants' Motion to Compel All Executed Questionnaires (ECF 84) is denied.

Dated November 30, 2022, at Kansas City, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge