# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| DONALD COE, et al.,<br>Individually and on behalf of all<br>others similarly situated,<br><br>  Plaintiffs,<br><br>v.<br><br>CROSS-LINES RETIREMENT<br>CENTER, INC., et al.,<br><br>  Defendants. | Case No. 2:22-cv-02047-EFM-ADM |

**REPLY IN SUPPORT OF**
**<u>MOTION FOR CLASS CERTIFICATION</u>**

I.      **Introduction**

In their 37-page opposition, Defendants vehemently challenge and criticize nearly every facet of the issues Plaintiffs aim to certify on behalf of the tenants at Cross-Lines Retirement Center, Inc. ("CLRC"). Notably, Defendants offer no suggestions for efficient case management and resolution. Moreover, they fail to contest the overwhelming evidence gathered, which unequivocally points to one conclusion: a **systemic failure** to adequately address the bed bug infestation during the class period.

When faced with similar situations, courts nationwide have concluded that class certification serves as the most efficient and equitable means of adjudication to effectively address the harm caused by bed bug infestations in multi-family housing.[1] Dismissing arguments from property owners and managers that individual inquiries would overshadow class-wide concerns, courts have opted to certify classes for the resolution of specific issues while reserving matters necessitating individual proof for later litigation.[2] This approach enables the class-wide resolution of distinct common issues, significantly advancing the progress of the litigation as a whole.[3] Consequently, when certifying particular issues under Rule 23(c)(4), it is only necessary to meet the requirements of Rule 23(a) and (b) concerning those specific issues.[4]

---

[1] See *Phillips v. Waukegan Housing Auth.*, 331 F.R.D. 341 (N.D. Ill. 2019); *Residents of Royal View Manor by and through McDowell v. Des Moines Municipal Housing Agency*, No. 16-1230, 906 N.W.2d 204 (Table), 2017 WL 2876241 (Iowa Ct. App. July 6, 2017) (unpub.); Order Granting Class Certification, *Hedgepath v. Kauffman*, No. 1916-CV01507 (Jackson Co., Mo. Cir. Ct. Dec. 5, 2022) Ruling on Plaintiff's Motion for Class Certification, *Residents of Elsie Mason Manor, et al. v. First Baptist Elderly Housing Foundation*, No. CV8116 (Polk Co., Iowa Dist. Ct. Nov. 8, 2011)

[2] *See* Ruling on Plaintiff's Motion for Class Certification at 25 *Residents of Elsie Mason Manor, et al. v. First Baptist Elderly Housing Foundation*, No. CV8116 (Polk Co., Iowa Dist. Ct. Nov. 8, 2011) (certifying a class for the determination of liability and preserving for a "separate proceeding of some character … to determine individual class members' entitlement to relief.") *Residents of Royal View Manor by and through McDowell v. Des Moines Municipal Housing Agency*, No. 16-1230, 906 N.W.2d 204 (Table), 2017 WL 2876241, at *3 (Iowa Ct. App. July 6, 2017) (unpub.) (noting that as "some tenants may have stronger claims… if necessary, it could create subclasses to manage the litigation.")

[3] *In re Motor Fuel Temperature Sales Practices Litigation*, 292 F.R.D. 652, 665 (D. Kan. 2013).

[4] *Id.*

The six discrete issues Plaintiffs ask to be certified are:

1. Has the infestation of bed bugs been so pervasive during the class period that every tenant was affected?

2. Did Defendants breach their standard of care by not requiring, and enforcing, the pest control companies to perform surrounding-unit inspections whenever a unit is found to have bed bugs?

3. Did Defendants breach their standard of care by refusing, or failing, to perform a full-building inspection of all units (Phase I and Phase II) at the same time?

4. Does the presence of bed bugs in an apartment make that unit unsafe, unsanitary, and/or unfit for living in?

5. Can an apartment which has bed bug have an above-zero fair market value?

6. Are extermination services "essential" for an apartment unit in a multi-family housing structure when an adjacent unit has live bed bug activity? If yes, what services are "essential" (i.e., inspection, treatment, etc.)?

In examining Issue #1, for example, courts have made certification rulings by finding that an extensive infestation – such as that which is an issue here – affects every tenant:

> The Plaintiffs actually allege that every unit in both buildings, *whether infested with bed bugs or not*, was subject to such a high probability of becoming infested at any time all units were uninhabitable … [and] every tenant … has been affected by the Defendants' alleged illegal conduct because, at the least they had to live with the stigma of living in one of those buildings….[5]

In *Waukegan*, another certified bed bug class action case authored by Judge John J. Tharp, Jr. from the Northern District of Illinois, those tenants suffered from a remarkably similar infestation to that presented here, the lowest infestation rate recorded during its class period was 22%.[6] Here, the lowest infestation rate was 24%, found in December 2022 by Defendants' expert.[7] Likewise, 94.2% of *Waukegan* residents received one treatment over its 7-year class period,[8] while

---

[5] Ruling on Plaintiffs' Motion for Class Certification at 17, *Residents of Elsie Mason Manor, et al. v. First Baptist Elderly Housing Foundation*, No. CV8116 (Polk Co., Iowa Dist. Ct. Nov. 8, 2011) (emphasis in original).
[6] *Phillips v. Waukegan Housing Auth.*, 331 F.R.D. 341, 345 (N.D. Ill. 2019)
[7] ECF No. 153-2, at 3, 12.
[8] *Waukegan*, 331 F.R.D. at 345.

2

CLRC reached a 90% treatment rate in just 6 years.[9] As Judge Tharp characterized the building-wide nature of the *Waukegan* infestation:

> *[A]t a minimum*, over half of the tenants experienced a bed bug infestation while living at Poe Manor, and there were likely more…. Indeed, there is no basis on the present record to infer that there are any members of the putative class who 'could not' or 'have not' been harmed by that conduct. Each tenant … could well have been harmed by the defendants' allegedly inadequate response to the infestation.[10]

This determination is also similar to that made by Jackson County, Missouri Circuit Judge Charles H. McKenzie, who recently certified a class of tenants that suffered a bed bug infestation in 2022 as "All Missouri tenants who resided at" the premises during the class period.[11]

Cases like *Elsie*, *Waukegan*, and *Hedgepath* provide a roadmap for effective case management which becomes evident as we further dissect Defendants' arguments below.

## II. Numerosity

Defendants claim that joinder is practicable because there would be subsequent non-class trials to address residual issues, which ignores the fact that this is the case in *all* issue classes;[12] moreover, to accept Defendants' position would render Rule 23(c)(4) meaningless and belie governing law.[13] Thus, as the class in this case will include at least 300 class members, joinder is impracticable and numerosity is satisfied.[14]

Defendants have cited no case denied on numerosity grounds, and Plaintiffs have found

---

[9] ECF No. 150-5 (Declaration of Christian Crocker), ¶ 6, Ex. A, Ex. B; ECF No. 150-6 (Declaration of Melissa Blevins).
[10] *Waukegan*, 331 F.R.D. at 349 (emphasis in original).
[11] Order Granting Class Certification, *Hedgepath v. Kauffman*, No. 1916-CV01507 at 5 (Jackson Co., Mo. Cir. Ct. Dec. 5, 2022)
[12] Manual for Complex Litigation (Fourth), s 21.24 ("An issues-class approach contemplates a bifurcated trial where the common issues are tried first, followed by individual trials on [other] questions …").
[13] *See In re Motor Fuel Temperature Sales Practices Litigation*, 292 F.R.D. 652, 665 (D. Kan. 2013) ("Certifying a class to determine defendant's liability, while leaving the class members to pursue their individual damages claims, is a common example of partial certification.")
[14] ECF No. 148, at 27; ECF No. 162, at 23.

only cases that assess numerosity as primarily about the size of the class.[15] Accordingly, not only would Defendants' construction nullify Rule 23(c)(4), having 300 different juries adjudicate 6 different issues could lead to sixty-four (64) different combinations of determinations.

Moving beyond mere figures, the underlying context further demonstrates the potential infeasibility of joinder. For example, similar to *Waukegan*, many Cross-Lines tenants are eligible for reduced-rent housing (receiving either direct or indirect HUD subsidies), such that they "are likely to lack the means or resources to litigate their cases on their own."[16] The value of individual claims in Waukegan is also contextually significant. Spanning over seven years, the *Waukegan* class period is longer compared to the six (and counting) years in this case. Taking into account Defendants' method of calculating damages in their opposition,[17] the more extended class period in *Waukegan* lends greater weight to the court's observation: "Further, it is far from clear that the damages recoverable for individual plaintiffs would make it cost effective to litigate these claims individually."[18] This case has involved tens of thousands of pages of document production, over a dozen depositions, and multiple subpoenas. The expenses incurred for discovery alone could easily surpass the damages awarded to any given class member.

Defendants' other arguments, such as the potential claim recoveries and the class members' interest in the case,[19] will be addressed under superiority.

## III. Commonality

Commonality asks whether there is *at least one* common question, while predominance

---

[15] *See In re Flint Water Cases*, 558 F.supp.3d 459, 501-02 (E.D. Mich. 2021) (numerosity satisfied for "issues and Damages Classes," focusing only on the size of the classes); *Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 294 (S.D. W. Va. 2015) (certifying liability issue class, finding numerosity after considering only the size of the class.).
[16] *Waukegan*, 331 F.R.D. at 350-51.
[17] $550/month for the full class period = $39,600. ECF No. 162, at 23-24. This figure also assumes tenancy for the entire class period, which is not the case for much of the class. *E.g.*, ECF No. 162, at 32 (Linda Smith moved into Cross-Lines in 2019).
[18] 331 F.R.D. at 351.
[19] ECF No. 162 at 24.

generally *weighs* the common questions against the individual questions. Defendants' flowery response—relying predominantly on block quotes with little analysis or application—largely overlooks the distinction.[20]

Rather, Defendants conflate the two to conclude that supposedly individualized issues "are inextricably linked to" the six issues Plaintiffs seek to have certified.[21] Defendants have not, however, (because they cannot) explained ***why*** those supposedly individualized issues would impact the six actual questions. For instance, Issue 4 asks whether the presence of bed bugs makes a unit uninhabitable, and yet Defendants do not explain what "time of tenancy," "location of apartment" "reporting of bed bug issues," or any of the other supposedly individualized issues have to do with this issue.

Defendants next contend that the issue of "whether Defendants breached their standard of care" cannot be resolved without "considering apartment conditions and tenant behavior," which Defendants characterize as being "intertwined with individualized questions of causation and comparative fault."[22]

This intermixing of the elements of a negligence claim, that is, conflating its first element (duty) with its second (breach) and third (causation), is contrary to governing law. As the Kansas Supreme Court explained, the conflation of the elements (there, duty and breach) impermissibly usurps the jury's fact-finding role:

> Particularized duties tend to sneak conclusions about the facts of particular cases into what are intended to be general standards. But duty rules are not meant to be fact specific. Rather, they are to set broadly applicable guidelines for public behavior. Otherwise, the line between the first and second elements of a negligence claim—duty and breach—are blurred…. [What] may (or may not) constitute a breach … are fact questions properly belonging to the second element

---

[20] ECF No. 162, at 24; *see also* ECF No. 148, at 27-28.
[21] ECF No. 162, at 24-25.
[22] ECF No. 162, at 19-20

5

of the negligence claim, not the first.[23]

In short, the determinations of duty, breach and causation are separate undertakings. Thus, Defendants' attempt to twist Issue 4's "yes or no" question on the issue of bed bugs rendering a unit unsafe, unsanitary and unfit into strict liability again ignores the distinctions between the three elements.[24]

Likewise, Defendants' different articulation of the standard of care (Issues 2 and 3) in this matter in no way supports rejection of Plaintiffs' proposed issue classes; to the contrary, the dispute demonstrates why the class will materially advance this litigation.[25] Issues 2 and 3 go to the breach of duty question—the determination of which "should be left to the jury."[26]

Defendants' claim that Issue 5, which asks if infested units have any value, "is not central to this litigation," wholly ignores Plaintiffs' actual claims;[27] moreover, the answer to that question will materially move the litigation forward as it will decide whether there will be a universal method of computing damages, or if each tenant would have to put forth evidence unique to their unit.[28]

The remaining two issues (Issues 1 and 6), likewise move the litigation forward by establishing or rejecting key evidence as to who was affected by the infestation, and what is an essential service, the latter of which is literally an element of Count Six: Failure to Provide Essential Services (K.S.A. 58-2653). Thus, as in *Waukegan*, Plaintiffs' questions assess whether "defendants' systemic response to the bedbug infestation was adequate," which is central to the

---

[23] *Reardon for Estate of Parsons v. King*, 310 Kan. 897, 904-05, 452 P.3d 849 (Kan. 2019).
[24] Id.
[25] *In re Motor Fuel Temperature Sales Practices Litigation*, 292 F.R.D. 652, 665 (D. Kan. 2013).
[26] *King*, 310 Kan. at 906.
[27] ECF No. 1, at ¶ 222, at ¶ 240, at ¶ 260, at ¶¶ 272-274, at ¶ 305.
[28] Importantly, this is separate from Defendants' comparative fault defense, as comparative fault is calculated and applied by the jury separately from computation of damages. Pattern Instructions Kansas 4th (Civil) 181.04.

claims.[29]

## IV. Typicality

As the Tenth Circuit has regularly recognized, where the claims—as here—are "based on the same legal or remedial theory, ***differing fact situations*** of the class members do not defeat typicality."[30] This is the fundamental flaw in Defendants' attack: they focus on alleged differences in factual circumstances, immaterial to the Issues for which certification is sought, without consideration for the "legal or remedial theories" Plaintiffs advance.[31]

While conceding that "commonality and [] typicality … tend to merge,"[32] Defendants incorrectly assert that this is Plaintiffs' only argument for typicality.[33] For instance, Plaintiffs noted that typicality requires only that the claims "be based on the same legal or remedial theory" and explained that the ***issues*** we seek to have certified are the same for Plaintiffs as they are to the absent class members.[34] Defendants cannot deny that Plaintiffs' *claims* advance the same theory. That is, Plaintiffs uniformly allege that Defendants violated their duty of care by failing and/or refusing to implement building-wide and cloverleaf inspections (Issues 2 and 3). Whether Plaintiffs' claims are *correct*—as Defendants dispute[35]—is a merits issue for the jury, not an issue for class certification.

The other issues are similarly uniform. As Defendants note, the named Plaintiffs have had periods where they believe their unit was not *presently* infested with bed bugs.[36] Defendants also

---

[29] 331 F.R.D. at 351.
[30] *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1198-99 (10th Cir. 2010) (emphasis added).
[31] *See also* ECF No. 107 at 16 ("Plaintiffs have identical legal interests."); *compare with* ECF No. 162 at 26 ("This element requires that representative plaintiffs ***possess the same interests*** …") (emphasis added).
[32] ECF No. 162, at 27.
[33] ECF No. 162, at 27.
[34] ECF No. 148, at 34.
[35] *See* ECF No. 162, at 28 (arguing Defendants may not have "breached their duties to the class members in the same way").
[36] *See, e.g.*, ECF No. 162, at 31-35.

7

claim (without any evidentiary support) that some tenants have *never* experienced bed bugs at Cross-Lines.[37] Thus, the issue of whether a tenant needed to *actively* have bed bugs in their apartment to be affected—Issue 1—is typical across the class. The uniformity of Plaintiffs' contentions—the crux of typicality—is explained in more detail above and in their motion.

Defendants' reliance on *Burdette* is unavailing, as it was not an issue class and is not binding. More to the point, *Burdette* saw named plaintiffs whose claims were "not based on the same legal theory of relief."[38] Here, Plaintiffs and the class all advance the legal theory that Defendants' breached their duties and caused their injuries by, *inter alia*, failing to implement building-wide and cloverleaf inspections—again, see Issues 2 and 3. The evidence on these issues, unlike the evidence in *Burdette*, does not vary across the class members, as Defendants have uniformly failed and/or refused to implement these inspections. The way bed bugs behave and migrate is also uniform.

Defendants' other arguments, such as how "extended" an experience with bed bugs was, are irrelevant as Plaintiffs do not seek certification for damages.[39] Similarly, Defendants' allusion to tenants' "own conduct or lack of cleanliness" is an affirmative defense not relevant to the specific issues to be certified. As *Waukegan* noted, questions of whether tenants "exacerbated the bedbug problem by failing to follow pest management instructions" do not defeat typicality.[40] This is because typicality "should be determined with reference to the defendants' actions, not with respect to particularized defense they might have against certain class members."[41]

---

[37] ECF No. 162, at 28.
[38] *Burdette v. Vigindustries, Inc.*, No. 10-1083, 2012 WL 405621, at *13 (D. Kan. Feb. 8, 2012).
[39] This also encapsulates Defendants' reliance on *Burdette*'s language about whether Plaintiffs "suffered the same injury." ECF No. 162, at 28. If "injury" means damages, it is irrelevant to this issue class. If "injury" concerns the theory of liability, Plaintiffs are typical, as they allege injury from the bed bug infestation.
[40] 331 F.R.D. at 352.
[41] 331 F.R.D. at 352 (quotation omitted).

## V. Adequacy

None of Defendants' adequacy challenges are relevant to the six Issues Plaintiffs seek to have certified.[42] Rather each of their arguments are simply strawman attacks that would never survive a Rule 401, 403 or other evidentiary objection at the issue class trial.

Defendants admit, "[t]hese facts might be irrelevant"[43] but try to contort them into the contention that some "tenants may not be comfortable with the representation,"[44] an irrelevant argument as those tenants may opt-out. Likewise, Defendants' quibble with minor factual variances between the proposed class representatives, do not actually "raise serious questions about their adequacy," particularly since Defendants have not identified either the questions or their materiality.[45]

Adequacy exists unless there is a "fundamental" conflict of interest which "go[es] to specific issues in controversy."[46] Defendants identify no conflicts of interest as to Linda Smith or Ed Yost,[47] and the conflict they seek to manufacture as to Donald Coe[48] is far from "fundamental" and is irrelevant to the Issues for which certification is sought.

## VI. Predominance

Defendants raise another strawman with their predominance issue, as Plaintiffs' argument is that they need not show predominance *as to the case as a whole*—only as to the specific issues

---

[42] Defendants do not contest the adequacy of proposed class counsel. *see generally* ECF No. 162; *see generally* ECF No. 162 at 29-31.
[43] ECF No. 162, at 31.
[44] ECF No. 162, at 31.
[45] ECF No. 162, at 31.
[46] ECF No. 148, at 34 n. 233
[47] If Defendants contend that other issues Smith and Yost have raised, such as a missing doorknob, present a conflict of interest, it is hard to see that being "fundamental" or in any way relevant to the six Issues for which certification is sought.
[48] ECF No. 162, at 29-31 (generally alleging Donald Coe was harassing tenants to get them to join this lawsuit). The evidence proffered, however, would not survive, *inter alia*, hearsay and best evidence objections.

9

for which certification is sought.[49] As to those six Issues, the common issues and evidence clearly predominate: as in *Waukegan,* "the common questions as to the systemic actions the defendants took, or failed to take, to address the bedbug infestation are foundational."[50] Predominance is satisfied.

## VII. Superiority

Class actions must be "unwieldy" before they "can be pronounced an inferior alternative" to no litigation at all.[51] With as many as sixty-four potential combinations of answers to the six Issues proposed, submitting those common questions for resolution in a single trial is far superior to risking dozens of different, potentially conflicting, jury verdicts. An issue class, then, is clearly superior for the efficient resolution of these common issues.

### a. Plaintiffs' proposed issue class is efficient and will materially advance the litigation.[52]

Defendants' argument that this case would be inefficient because "the mini-trials would still have to resolve" some outstanding issues, if accepted, would nullify Rule 23(c)(4);[53] it also ignores the whole point of an issue class.[54] As Judge Posner identified:

> Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues. Those solutions include "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3)

---

[49] ECF No. 148, at 36-37 ("… the analysis under Rule 23(b)(3) is different … predominance and superiority analysis are applied within the context of the Rule 23(c)(4) issue class and not to the claims and causes of action as a whole…"); *See In re Motor Fuel Temp. Sales Prac. Litig.*, 279 F.R.D. 598, 613-14 (D. Kan. 2012) ("In other words, even if individualized issues predominate the issue of damages, the court believes that common questions nonetheless predominate in this case because common questions will govern the more difficult, threshold liability issues....") (quotation omitted).
[50] 331 F.R.D. at 354.
[51] *Carnegie v. Household Int'l Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).
[52] These issues overlap, as all arguments for why our proposed issues would materially advance the litigation are also arguments for why our proposed issue class would be more efficient, and vice versa.
[53] ECF No. 162, at 37.
[54] *E.g.*, ECF No. 162, at 38 ("Certifying a class to determine defendant's liability … is the common example of issue certification which materially advances the disposition of the litigation."). *See In re Motor Fuel Temperature Sales Practices Litigation*, 292 F.R.D. 652, 665 (D. Kan. 2013) ("Certifying a class to determine defendant's liability, while leaving the class members to pursue their individual damages claims, is a common example of partial certification.")

decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class."[55]

Likewise, their concern with their comparative fault defense is premature as causation is not encompassed in the proposed class.[56] Defendants also misstate what issues would remain after the issues trial, as Issues 2 and 3 will dispose of liability, since they ask *the* breach question as framed by the Kansas Supreme Court.[57]

### b. Plaintiffs' proposed issue class would not violate the Seventh Amendment re-examination clause.

Defendants' argument that the Seventh Amendment would be violated by the class ignores governing law and the class to be certified:

> The existence of common factual issues is to be distinguished from the existence of overlapping evidence. For purposes of the Seventh Amendment, the question is whether factual issues overlap, thus requiring one trier-of-fact to decide a disputed issue that must be decided by a subsequent jury, not whether the two fact-finders will merely have to consider similar evidence.[58]

Through meticulous design of the special verdict form for the issues class trial, the parties and the Court can ensure full compliance with the Seventh Amendment and safeguard constitutional rights. Courts to have recently opined on the issue agree:

> [T]he Seventh Amendment does not bar Rule 23(c)(4) issues certification. Mindful of the Sixth Circuit's guidance—as well as conventional wisdom, *see Manual for Complex Litigation*, Fourth, § 22.755; 2 *Newberg on Class Actions* § 4:92 (5th ed. 2010)—that careful trial management can allay Seventh Amendment

---

[55] *Carnegie v. Household Intern., Inc.*, 376 F.3d 646, 661 (7th Cir. 2004) *quoting In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 141 (7th Cir. 2001) (abrogated on other grounds).
[56] *E.g.*, Pattern Instruction Kansas 4th (Civil) 105.05; *Dodge City Implement, Inc. v. Bd. of Cnty. Com'rs of Cnty. of Barber*, 288 Kan. 619, 626, 205 P.3d 1265 (Kan. 2009) (noting that comparative fault is sometimes called "comparative causation"); *Yount v. Deibert*, 282 Kan. 619, 633-34 (Kan. 2006) ("The nature of misconduct in such cases is to be expressed on the basis of degrees of comparative fault or causation and the 'all or nothing' concepts are swept aside."); *Sinclair v. Rodriguez*, No. 20-1116, 2022 WL 558119, at *5 (D. Kan. Feb. 24, 2022) ("Kansas law on comparative fault requires … a showing that the violation caused or contributed to the event which brought about the injury.")
[57] *Supra*, discussion of *Reardon for Estate of Parsons v. King*, 310 Kan. 897, 452 P.3d 849 (Kan. 2019).
[58] *Allison v. Citgo Petrol. Corp.*, 151 F.3d 402, 423 n.21 (5th Cir. 1998).

reexamination concerns, the Court intends to proceed with great care during trial. The Court welcomes the participation of the parties in formulating trial plans, jury instructions, and verdict forms that crystallize the applicable issues and clarify those already decided.[59]

Defendants' reliance on *Rhone-Poulenc* is inapposite, for in that case the plaintiffs sought certification as to only some of the theories of liability. We do seek to do that here; Plaintiffs' theory of liability with respect to the bed bug infestation throughout the class period ultimately stems from the lack of building-wide and cloverleaf inspections. Further, *Rhone Poulenc*'s comparative fault discussion is not based on Kansas law, as will be the case here. As noted above, Kansas law views comparative fault as a causation question; that is, the issue class jury could conclude that Defendants breached their duty of care (see Issues 2 and 3) while the individual juries could find that the *specific damages* each plaintiff sustained were caused entirely by the plaintiff (and not by Defendants' breach). The entirely separate issue of a particular plaintiff's "fault" means no re-examination occurs in violation of the Seventh Amendment.

This is akin to *In re Flint Water Cases* where that defendant's argument - that breach, causation, and allocation of fault (i.e. comparative fault) would result in the same evidence overlapping at various phases of the case - was rejected.[60] As the *Adkisson* court concluded, any Seventh Amendment concerns "will more appropriately be analyzed on a fully developed record rather than the product of before-the-fact speculation."[61]

Finally, in addition to careful trial management,[62] this Court would retain the authority to

---

[59] *In re Flint Water Cases*, 558 F.Supp.3d 459, 523 (E.D. Mich. 2021); accord 2 Newberg on Class Actions s 4:92 (5th ed. 2010) ("[T]he Seventh Amendment does not seem to pose a significant obstacle to the use of issue classes….so long as courts are careful to certify only those issues… that are sufficiently separable from individual trial issues.")
[60] *In re Flint Water Cases*, 558 F.Supp.3d 459, 522-23 (E.D. Mich. 2021); *accord Adkisson v. Jacobs Eng'g Grp., Inc.*, 370 F.Supp.3d 826, 836 (E.D. Tenn. 2019) (finding no Seventh Amendment concern as the issue of breach was bifurcated from "specific causation with respect to individual plaintiffs.")
[61] 370 F.Supp.3d at 837.
[62] *E.g.*, *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 416-17 (6th Cir. 2018) ("At this stage, the district court has not formalized any procedures for resolving either the common issues or the remaining individualized inquiries. The certification decision outlines one option, but the district court may ultimately find that another

decertify, or modify, the class as appropriate. To the extent Defendants attempt to manufacture or force a re-examination issue by how they approach trial planning or the evidence they put on, they should be considered to have waived applicability of the Seventh Amendment's re-examination clause.

### c. Class members' motivation and potential recoveries.

Defendants' argument about "class member motivation" is, essentially, irrelevant to the certification determination. Moreover, while many tenants are indeed motivated, with many having retained proposed class counsel, there is no indication that other tenants have displayed an interest "in controlling the litigation,"[63] and Plaintiffs are not aware of any instances where a tenant has filed these claims in a separate action.[64] In addition, Defendants' reference to the tenants' potential recoveries ignores the costs of litigation. The financial feasibility of litigation is not merely determined by the potential damages, but the *cost of getting there*.[65]

Nor is this case like *Emig*[66] or *Zapata*,[67] each of which sought class certification as to the case as a whole,[68] in contrast to the issue class approach here where the class members would retain control over prosecution of their individual damages claims. Further, in *Zapata*, there was evidence of prior suits against the defendant for the same or similar issues and significant

---

procedure better facilitates the fair resolution of Plaintiffs' claims. Because the district court has not settled on a specific procedure, no constitutional infirmities exist at this time."); *Olden v. LaFarge Corp.*, 383 F. 3d 495, 509 n. 6 (6th Cir. 2004) ("…if done properly, bifurcation will not raise any constitutional issues. We are confident that the defendant will appropriately raise any concerns with the district court, if the court eventually proposes to bifurcate the case in such a manner as to potentially jeopardize any of its rights.").
[63] Id.
[64] *See Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 924-25 (10th Cir. 2018).
[65] *E.g.*, *In re Motor Fuel Temp. Sales Prac. Litig.*, 292 F.R.D. 652, 674 (D. Kan. 2013) ("…the amount at stake for individual class members is small ***relative to the cost of maintaining a separate action***…" (emphasis added)).
[66] *Emig v. Am. Tobacco Co., Inc.*, 184 F.R.D. 379 (D. Kan. 1998).
[67] *Zapata v. IBP, Inc.*, 167 F.R.D. 147 (D. Kan. 1996).
[68] In *Emig*, the Plaintiffs did alternatively seek certification of an issue class, but the court rejected it for lack of specificity of the issues to be certified or how those issues would advance the litigation, not whether the class members had an interest in controlling litigation. 184 F.R.D. at 395.

manageability concerns about handling of damages.[69]

**VIII. Conclusion**

Plaintiffs' approach in this matter was the result of a meticulously compiled record which revealed the glaring inadequacy of Defendants' efforts to manage the bed bug infestation during the class period compared to the standard of care. Consequently, the comprehensive record established, and the evidence gathered concerning the bed bug infestation during the class period demonstrate precisely why Defendants are reluctant to have these questions addressed by a jury. Their systemic failure to address the situation according to the standard of card is the exact reason the residents of Cross-Lines find themselves in a situation where a 24% infestation rate is "acceptable". It isn't.

For the foregoing reasons, Plaintiffs' Motion for Class Certification on the issues presented should be granted, the named Plaintiffs appointed as class representatives, and the law firms and attorneys listed below appointed a class counsel.

---

[69] 167 F.R.D. at 163-64.

Respectfully submitted,

*/s/ Bryce B. Bell*

| | |
|---|---|
| **BELL LAW, LLC** | **LIPMAN LAW FIRM** |
| Bryce B. Bell KS#20866<br>Jenilee V. Zentrich KS#29098<br>Andrew R. Taylor KS#28542<br>2600 Grand Blvd., Suite 580<br>Kansas City, MO 64108<br>T: 816-886-8206<br>F: 816-817-8500<br>Bryce@BellLawKC.com<br>JZ@BellLawKC.com<br>AT@BellLawKC.com | Jeffrey M. Lipman (*PHV*)<br>1454 30th Street, Unit 205<br>West Des Moines, IA 50266<br>T: 515-276-3411<br>F: 515-276-3736<br>jeff@lipmanlawfirm.com<br><br>**HEARTLAND CENTER FOR JOBS AND FREEDOM**<br><br>Gina Chiala (*PHV*)<br>Any Sweeny Davis (*PHV*)<br>4044 Central Street<br>Kansas City, MO 64111<br>ginachiala@jobsandfreedom.org<br>amysweenydavis@jobsandfreedom.org |

***Attorneys for Plaintiffs***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed with the Court's CM/ECF e-Filing system on April 14, 2023 and thereby served upon all attorneys of record.

*/s/ Bryce B. Bell*