## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DONALD COE, LINDA SMITH,
and EDWARD YOST,
Individually and on behalf of all
others similarly situated,

      *Plaintiffs,*

 vs.                                       Case No. 22-2047-EFM


CROSS-LINES RETIREMENT
CENTER, INC., and YOUNG
MANAGEMENT CORP.,

      *Defendants.*

### MEMORANDUM AND ORDER

Before the Court are competing Motions to Exclude Expert from the parties (Docs. 141 and 153) each seeking to exclude the other's expert witness. First, Defendants Cross-Lines Retirement Center, Inc. ("Cross-Lines") and Young Management Corp. ("Young") seek to exclude the testimony of Plaintiffs' expert Jeffrey White. For their part, Plaintiffs Donald Coe, Linda Smith, and Edward Yost move to exclude Defendants' expert witness, David Poplin. For the reasons set forth below, the Court grants each Motion in part and denies them in part.

### I.     Factual and Procedural Background

Each of the named Plaintiffs, two septuagenarians and one octogenarian, rent residential apartments in apartment complexes owned by Cross-Lines and operated by Young, Cross-Lines'

property manager.  Cross-Lines is a nonprofit corporation, with its mission statement having as its goal the provision of rental housing to elderly families and individuals.  Because of its nonprofit status, Cross-Lines receives federal subsidies to purportedly allow it to offer lower rent.

The facts underlying Plaintiffs' claims are fairly straightforward.  As colorfully stated in Plaintiffs' Complaint, the apartments' neglected condition leaves "elderly and disabled tenants captive to bed-bug infestations, decaying rodent bodies, flooding, leaking, and mold."  Plaintiffs initially filed nine claims against Defendants, with seven remaining after a successful partial motion to dismiss.

At present, Plaintiffs seek class certification as to six issues relating to the bed bug infestations at Cross-Lines.  In support of their motion for class certification, they rely on the testimony of Jeffrey White.  White has what can only be described as an impressive resume, having a masters degree in entomology, 17 years' experience in pest control, and numerous peer-reviewed publications and public speaking engagements on the subject.[1]  White's credentials and expertise is not at issue in Defendants' Motion.

In preparation for testifying in this case, White reviewed bed bug infestation maps at Cross-Lines, treatment records by Blue Beetle, Focused, and ProPest, random pest control records to corroborate the other datasets, and Cross-Lines floor plans and Standard Operating Procedures.  This dataset amounted to over 1,400 pages.  On November 15, 2022, White conducted an inspection of the Cross-Lines apartment complex.  Instead of inspecting the entire building, White chose 46 units that were a mix of those showing a history of bed bug infestation and adjacent units that had not reported bed bugs in 2022.  The stated purpose of this inspection was to determine

---

[1] Defendants do not dispute White's qualifications as an expert in this case for the purposes of this Order..

whether bed bugs infestations were going unreported and whether bed bugs were migrating to adjacent units.  Over half of the inspected apartments showed bed bug activity, with many of those infested apartments never having reported bed bugs in 2022.  Relying on the records, White opined that Cross-Lines has experienced a severe bed bug infestation, with as much as 30% of the building affected at one time.  He also opined that many tenants likely did not report bed bug activity, citing a study of low income apartment building in New Jewelry showing that up to 70% of bed bug infestations went unreported.

As to the appropriate standard of care for treating bed bugs infestations and preventing reinfestations, White states that "clover-leaf" inspections of adjacent apartments are necessary to determine whether bed bugs remain after treatment.  Without such inspections, White states that reinfestation of units due to re-migrating bed bugs is highly likely.  He also opines that proactive building-wide inspections are necessary, while tenant preparation prior to treatment is helpful but not vital to successful treatment.

White also offers the following opinion on the proper measures property management should take to deal with the problem:

> After consecutive years of no improvement (or worsening conditions) of the bed bug issue, it would be reasonable for a property management company to develop a plan that aims to reduce the bed bug infestation rate.  That said, as noted by the above table, the property management company (Defendant Young Management Company) that has handled day-to-day property management at Cross-Lines since approximately September 2016 has failed to develop a proactive plan to reduce the bed bug infestation rate and continues to expose many, if not most or even all, of their residents to bed bugs infestation—and bites.  There are pest control records noted that the pest management professional mentions to the property management company that a building-wide inspection would be highly recommended as well as surrounding unit inspections yet the property management company never follows through with the pest management companies recommendations.[2]

---

[2] Jeff White Rep. at 4.

Finally, White offered testimony regarding the typical medical effects of bed bug bites. Relying on several studies and a treatise in his field detailing the medical effects from bed bug bites, White opined that "it is highly likely that many of the residents within the Cross-Lines Retirement Center had an increase in mental health issues due to the exposure to bed bug infestations."

Although he lacks the formal education, publications, and public spotlight that White has, Defendants' expert, Poplin, has over 30 years' experience in pest control and currently runs his own pest control company.  In his deposition, Poplin testified that he also has served as a pest control advisor to the federal government.  Poplin conducted a building-wide inspection of Cross-Lines on December 20, setting bed bug traps that were then retrieved on December 27.  This was after Cross-Lines had hired an exterminator to deal with the bed bug infestations found by White's inspection.  Bed bugs were found in 24% of the units, while over half had what Poplin considered "clutter" or poor sanitation conditions.  Prior to offering his report, Poplin did not review any of the records in this case.  Nevertheless, Poplin testified that the lack of tenant preparation has always been a contributing factor to bed bug infestations at Cross-Lines.

Defendants also seek to admit Poplin's testimony as to the effect of the COVID-19 pandemic on the pest control industry.  Namely, Poplin states that during the pandemic, residents would often refuse to let in pest control agents for fear of contracting COVID.

Poplin also wishes to provide expert testimony as to the appropriate standard of care for treating and preventing bed bug infestations, arriving at an opposite conclusion to White in nearly every way.  First, he opines that clover-leaf inspections are unnecessary, while tenant preparation is absolutely key to success—in effect, the opposite of White.  In support of these statements,

Poplin opines that bed bugs do not migrate, although he later retracted this absolute in his deposition. Poplin further citizens White's methodology and opinion for a number of reasons irrelevant to this Order.

On February 24, 2023, Plaintiffs filed their motion for class certification. That same day, the parties each filed their respective Motions to Exclude the others' expert.

## II.      Legal Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Under this rule, the Court must first "determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion."[3] If so, then relevant expert opinion testimony is admissible if: (1) such testimony is based upon sufficient facts or data; (2) it is a product of reliable principles and methods; (3) the witness applied the principles and methods reliably to the facts of the case; and (4) the testimony is helpful to the trier of fact.[4] As these requirements demonstrate, the court is charged as a gatekeeper to admit only expert testimony that is relevant and reliable.[5] This is a flexible inquiry specific to the facts of the case at bar.[6] The burden is on the party offering the expert testimony to show that it is admissible.[7] However, "[t]he plaintiff need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community[, only] that the method employed by the expert

---

[3] *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (internal quotation marks and citation omitted).

[4] Fed. R. Evid. 702.

[5] *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

[6] *Id.* at 593; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (rejecting formulaic application of reliability factors discussed in *Daubert* because "[t]oo much depends upon the particular circumstances of the particular case at issue").

[7] *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements."[8]

A *Daubert* analysis may be necessary when plaintiffs rely on that expert's opinion to certify a class under Fed. R. Civ. Proc. 23.[9]  However, this need not be a full-fledged *Daubert* analysis because "as the parties remain engaged in merits discovery at the class certification stage, the information available to experts is limited."[10]  Accordingly, "any *Daubert* analysis performed by the court will focus primarily on: (1) the knowledge, training, experience, and qualifications of the expert; and (2) the methodology relied on by the expert in formulating the challenged opinion."[11]  In reviewing the latter,  "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate."[12]  Furthermore, any conclusions regarding the experts' testimony reached at this stage "is subject to amendment for purposes of the class certification determination and is not finally determinative of the admissibility of the expert's testimony at a trial on the merits."[13]

---

[8] *Windham v. Circuit City Stores, Inc.*, 420 F. Supp. 2d 1206, 1211 (D. Kan. 2006) (quoting *Mitchell v. Gencorp. Inc.*, 165 F.3d 778, 781 (10th Cir.1999)); *see also Foster v. USIC Locating Servs., LLC,* , 2018 WL 3757567, at *3 (D. Kan. 2018) ("[R]ejection of expert testimony is the exception rather than the rule.") (citing Fed. R. Evid. 702 advisory committee's notes).

[9] *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2019 WL 1569294, at *3 (D. Kan. 2019) ("If, for instance, a plaintiff relies entirely on expert evidence to satisfy a Rule 23(a) requirement for certification, a nearly full-fledged *Daubert* analysis may be appropriate.").

[10] *Id.* at *4.

[11] *Id.*; *see also In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 614 (8th Cir. 2011) ("We conclude that the district court did not err by conducting a focused *Daubert* analysis which scrutinized the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence.").

[12] *Daubert*, 509 U.S. at 595.

[13] *In re EpiPen*, 2019 WL 1569294, at *4.

"The [C]ourt has discretion to determine how to perform its gatekeeping function under *Daubert*."[14]  The Court may, but is not required to, conduct a *Daubert* hearing to fulfill this role.[15]  Here, neither party has requested a *Daubert* hearing, and after reviewing the parties' briefs, the Court concludes that the Motions can be decided without a *Daubert* hearing.

### III.    Analysis

**A.    Plaintiffs' expert: Jeffrey White**

First, the Court will address Defendants' Motion to Exclude the testimony of Plaintiff's proposed expert Jeffrey White.  Defendants raise three issues with White's testimony: (1) White's "cherry-picking" units for inspection was an unreliable methodology; (2) he seeks to offer testimony outside of his expertise as to professional managerial duties and medical symptoms caused by bed bugs; and (3) he improperly compares Cross-Lines to New Jersey building studies without knowledge of the buildings' similarities.

#### 1.    White's methodology for testing units

Here, the crux of Defendants' argument is that White handpicked the apartments which he and his team inspected rather than taking a random sampling.  Instead of inspecting all 208 units at Cross-Lines, White selected 46  "units that were a mix of units that were reporting a history of bed bug activity as well as units around those units that had not reported any issues in 2022."  As White explained in his deposition, he purposefully chose to inspect "hot spots" along with adjacent units that had not reported activity.  He sought to determine if bed bugs were migrating from infested units to those nearby and to see if infestations were going unreported.  Along with this

---

[14] *In re EpiPen (Epinephrine Injection, USP) Mktg. Sales Practices & Antitrust Litig.*, 2020 WL 1164869, at *3 (D. Kan. 2020) (citing *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019)).

[15] *Id.* (citing *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000)).

"nonprobability" sampling, White analyzed the extensive data regarding bed bug infestations at Cross-Lines, treatment records by Blue Beetle, Focused, and ProPest, as well as random pest control records to corroborate the other datasets.

Defendants' argument, which relies heavily on quotations from the Reference Manual on Scientific Evidence,[16] overlooks two things. First, White's conclusions were not based solely on the November 15 sampling but also on the extensive data regarding infestations at Cross-Lines. White specified in his report that he had considered "Blue Beetle Pest Control Records[,] Cross-Lines Floor Plans[,]  Focused Xtermination Pest Control Records[,] ProPest Pest Control Records[,] Standard Operating Procedures for Cross-Lines Retirement Center, [and] Bed bug infestation maps by year." White's report makes clear that his conclusions regarding the buildings' condition as a whole is based on this data viewed through the lens of his education, training, and experience.

Defendants note that White did not consider the Unified Wyandotte County government records in arriving at his opinion. Notably, Defendants point to a January 2020 inspection by government employees which found "no issues." Indeed, at White's deposition, he said he was unfamiliar with those documents. However, the depositions of those government employees who performed the January 2020 inspection makes clear that they did not perform bed bug inspections. Furthermore, the Court is provided no reason to suspect that those records otherwise contradict the pest control and inspection records that White reviewed, especially since one of the significant issues discussed in those documents is reinfestation of units. In any case, the question at this stage is not whether the expert has reviewed all the potential evidence, but whether the methodology

---

[16] David H. Kaye & David A. Freedman, Reference Guide on Statistics, Federal Judicial Center, *Reference Manual on Scientific Evidence* 174 (3d ed. 2011).

was reliable for the conclusion reached.  The same reasoning applies to Defendants' argument that White overlooked Yost's statement that his bed bugs had been successfully treated on December 22, 2021.  To critically evaluate White's testimony by comparing it to other evidence is improper at this stage in the litigation.  Therefore, the Court does not find this failure to review the government records indicative of unreliable methodology.

Second, White justified the selective sampling method as specifically intended to identify (1) whether bed bug infestations were going unreported and (2) whether bed bugs were spreading to adjacent apartments such that cloverleaf and building-wide inspections are necessary.  The Court is not convinced that White's selective sampling was an unreliable methodology for attempting to answer those questions.  Once again, White's report was clear—he relied on the entire reviewed record when arriving at his expert opinions.  In fact, it appears from his report that the November 15 inspection only served to demonstrably affirm data already published in the form of a learned treatise, i.e., that bed bugs migrate to adjacent apartments and many infestations go unreported.  Given the specific function served by White's selective inspection, the Court finds that White, at this stage, employed reliable methodology in arriving at his expert opinion.

2.    *White's testimony on property care and medical issues*

Second, Defendants contend that White improperly gave expert testimony outside the scope of his expertise.  Specifically, Defendants contend that White is unqualified to give expert testimony regarding necessary measures property managers must implement to deal with bed bug

infestations and medical symptoms resulting from bed bug bites.  As held by the Tenth Circuit, an expert may only testify on subjects "within the reasonable confines" of his expertise.[17]

As to the first, Defendants cite to White's expert report, which states in relevant part:

> After consecutive years of no improvement (or worsening conditions) of the bed bug issue, it would be reasonable for a property management company to develop a plan that aims to reduce the bed bug infestation rate.  That said, as noted by the above table, the property management company (Defendant Young Management Company) that has handled day-to-day property management at Cross-Lines since approximately September 2016 has failed to develop a proactive plan to reduce the bed bug infestation rate and continues to expose many, if not most or even all, of their residents to bed bugs infestation—and bites.  There are pest control records noted that the pest management professional mentions to the property management company that a building-wide inspection would be highly recommended as well as surrounding unit inspections yet the property management company never follows through with the pest management companies recommendations.[18]

It is clear from this statement that White is venturing beyond his expertise to opine as to the property management standards.  While White remains free to discuss the bed bugs infestations themselves, he is not qualified to give an opinion as to the actions of Cross-Lines property managers.  Therefore, White's opinion on this point must be excluded.

However, White's opinion regarding the potential medical issues stemming from bed bug bites is within the reasonable scope of his expertise.  Citing several published studies, White opines that bed bugs can cause "itchy" bites, anemia, and even mental health issues like insomnia, stress, and anxiety.  White extrapolates from these studies that "it is highly likely that many of the residents within the Cross-Lines Retirement Center had an increase in mental health issues due to the exposure to bed bug infestations."

---

[17] *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2001); *see also Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013) (quoting *Ralston* to hold that an expert with Ph.D. in business and experience in human-resource management could not testify as an expert on sex stereotyping).

[18] Jeff White Rep. at 4.

Once again, Defendants do not challenge White's expertise in treating bed bugs, only that he is not qualified to give medical opinions. The Court agrees, while finding that White is not giving medical opinions here. The effects of bed bug bites is a subject well within the reasonable confines of White's expertise. Furthermore, White does not state that Cross-Lines residents experienced medical issues stemming from the 1,500 bed bug infestations, but rather that it is "highly likely that many" of them did. This is not a medical opinion, but rather a statistical inference drawing on scientific studies and White's knowledge, training, education, and experience. To date, no expert medical opinion has been offered by either party as to any actual medical conditions suffered by residents because of the bed bug infestations. Therefore, the Court concludes that White's testimony as to possible side effects resulting from bed bug bites is a reliable expert opinion.

3.    *White's comparison of New Jersey to Cross-Lines.*

Finally, Defendants attack White's comparison of a study of New Jersey low-income high rises showing that 70% of residents often fail to report bed bug infestations to Cross-Lines. Relying on this data, as well as the documented cases of infestation within Cross-Lines, White estimates that 30% of units may have been infected at the same time.[19] The bulk of Defendants' argument addresses White's familiarity with the details of the building where the New Jersey study took place. However, White cites the study for its data on *people* reporting bed bug infestations, not for the building's similarity to Cross-Lines. Defendants' argument regarding the New Jersey tenants' preparedness for extermination and overall cleanliness is irrelevant on this point. Similarly irrelevant is Defendants' insistence that bed bugs are an individualized issue. To the

---

[19] It is worth nothing that Defendants' expert, David Poplin, also references Cross-Lines residents' failure to report pest activity as a contributing condition to the rate of infestation.

extent Defendants rely on their own expert's testimony, or that of the different exterminators, any conflicting testimony goes more to the weight of White's opinion, not its admissibility.  In that regard, Defendants offer no real objection to White's testimony.

Under the same heading within their brief, Defendants object to White's testimony that bed bugs migrate to surrounding units, which often results in reinfestations.  Plaintiffs point out that in arriving at this opinion, White relied upon multiple published studies, including the "mark, release, recapture study" and a genetic study of bed bugs within the same building.  Furthermore, the data reviewed by White showing the units that needed retreating for bed bugs also provides support for White's opinion.  Thus, the Court concludes that Plaintiffs have met their burden in showing that White's expert opinion as offered at this stage in the case is reliable, thus passing *Daubert*'s muster.

## B.    Defendants' expert: David Poplin

Plaintiffs challenge Defendants' expert, David Poplin on multiple grounds.  First, they claim that his lack of formal education or experience with "multi-unit, low-income, elderly and disabled residential housing" within the last five years renders him unqualified to give an opinion as to how to treat Cross-Lines' units or the appropriate standard of care.  Second, Plaintiffs' consider his testimony regarding the impact of the COVID pandemic on the pest extermination industry to be unreliable and unhelpful to a jury.  Third, Plaintiffs contend that Poplin's failure to review any of the treatment records before his inspection in December 2022 makes him unqualified to testify about Cross-Lines' condition at any other time within the proposed class period.  Finally, Plaintiffs raise a bevy of arguments relevant to the weight of Poplin's testimony yet irrelevant to its admissibility.

*1.      Poplin is qualified as an expert in bed bugs based on his experience.*

Regarding the first issue, the Court recognizes that experience alone may qualify an expert under *Daubert*.[20]  Despite lacking distinguishing letters after his name, Poplin has thirty years of experience in pest control.  This extensive experience includes treating many apartment complexes, at least one of which contained over 600 units.  Even though Poplin has not serviced an apartment complex in the last five years, the Court finds that Poplin is qualified to give an opinion as an expert in this case.

*2.      Poplin's testimony about the COVID pandemic's effects on the pest control industry would be helpful to a jury.*

As to the Plaintiffs' second argument, doubtlessly, the overall effects of the COVID pandemic will be familiar to a jury.  Probably unfamiliar to a jury are the details of how the pandemic impacted the pest control industry.  Poplin, with his experience-based expertise, is well qualified to provide an opinion on the subject.  And this particular perspective would help the jury understand the impact of the pandemic on the pest control industry in general and its ability to provide services during the class period, which could inform their understanding of Cross-Lines' infestation rates.[21]  Therefore, the Court will admit Poplin's testimony on the subject.

*3.      Poplin's testimony about bed bug infestation at Cross-Lines is reliable only as to his December 2022 inspection.*

Plaintiffs next argue that Poplin failed to use reliable methodology in arriving at his opinions about the bed bug infestations rates at Cross-Lines throughout the proposed class period. Poplin admits in his deposition that he never reviewed any of the treatment records, White's report,

---

[20] *See, e.g.*, *United States v. Beltran-Palafox*, 731 F. Supp. 2d 1126 (D. Kan. 2010) (finding dog trainer's "expertise is largely based on experience, rather than formal education" and admitting his expert testimony).

[21] Naturally, Poplin has no basis from which to testify as to the actual effect of the pandemic on Cross-Lines.

or any other materials prior to giving his expert report. That report, based on his experience in the pest control industry and a building-wide inspection completed on December 22, 2022, opined that Cross-Lines was not facing a building-wide bed bug problem. Defendants admit that Poplin's unfamiliarity with the record here makes him unqualified to testify about infestation rates before his December 2022 inspection. The Court agrees. Therefore, Poplin's testimony regarding bed bug infestation at Cross-Lines is admissible only to the extent it does not stray beyond the results of his December 2022 inspection.

During his inspection, Poplin recorded clutter and poor sanitation conditions in over half of the inspected units. From this, Poplin concluded that tenant cooperation has always been a consistent problem at Cross-Lines. Given that Poplin has reviewed no records or data regarding tenant cooperation at Cross-Lines, this opinion stems from nothing but Poplin's own ipse dixit. As such, Poplin's testimony regarding tenant cooperation at Cross-Lines during the class period must be excluded.

> 4.   *Plaintiffs' remaining argument attack the weight of Poplin's testimony, not its admissibility.*

Finally, Plaintiffs contend that Poplin's opinions on the appropriate standard of care, apartment preparation, White's methodology and opinion, and the migration patterns of bed bugs are unreliable. Plaintiffs frame most of their arguments as attacking Poplin's methodology. In doing so, they rely on White's expert testimony, his academic sources, and the National Pest Management Association's standards to show Poplin's conclusions are "unreliable."

A time and place for a battle of the experts exists, but it is not here. Where a party's reasons for excluding expert testimony "do not tend to bear on the reliability or relevancy of [the expert]'s opinions, but whether or not they are correct," the issue "is best left to the trier of fact to determine

how much weight to give to each expert's opinions."[22]  Despite framing their argument as attacking Poplin's reliability, Plaintiffs only seek to prove that he is wrong.  That is not a proper issue for the Court to consider in a motion to exclude.  Instead, Plaintiffs' arguments pertain to the weight that should be given to Poplin's opinion—not its admissibility.  Because Poplin is well qualified by experience as an expert in bed bug extermination and his opinions stem from that experience, the Court holds that Poplin's testimony is admissible regarding: (1) the effect of the COVID pandemic on the pest control industry (2) the appropriate standard of care for treating bed bugs; (3) White's methodology and opinion; and (4) the migration patterns of bed bugs.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Exclude the opinions and testimony of Jeffrey White (Doc. 141) is **GRANTED in part** and **DENIED in part.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exclude the opinions and testimony and David Poplin (Doc. 153) is **GRANTED in part** and **DENIED in part**.

**IT IS SO ORDERED.**

Dated this 18th day of May, 2023.


ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE

---

[22] *Frederick v. Swift Transp. Co.*, 591 F. Supp. 2d 1149, 1155 (D. Kan. 2008*), aff'd,* 616 F.3d 1074 (10th Cir. 2010).